61 N.J. Super. 561 (1959)
162 A.2d 97
ARGENTINO PELLEGRINO, PETITIONER-RESPONDENT,
v.
MONAHAN McCANN STONE COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1959.
Decided November 24, 1959.
*563 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Isidor Kalisch argued the cause for respondent-appellant.
Mr. Aaron Gordon argued the cause for petitioner-respondent.
The opinion of the court was delivered by PRICE, S.J.A.D.
By this appeal appellant seeks the reversal of a judgment entered in favor of petitioner in the *564 County Court affirming the judgment of the Workmen's Compensation Division.
We have analyzed the evidence in the case "to determine the facts and evaluate them," giving "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses." Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958) and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 448 (1958). The sole issue presented by this appeal is whether or not petitioner established by a preponderance of believable evidence that the lost vision of his right eye was causally related to his admitted employment. It is not denied that petitioner suffered a detachment of the retina of that eye and a resultant total loss of vision therein.
Preliminarily, and because of appellant's claim that it is a significant factor, we note and hereinafter refer to the chronology of events leading to the judgment based on the injury alleged to have been sustained on February 9, 1955. The petition was filed July 12, 1955. The initial date of the formal hearing was May 2, 1957. The second day of the hearing was December 19, 1957. The Deputy Director's decision was rendered April 29, 1958 and judgment thereon entered May 20, 1958.
Petitioner claims that the accident on which the judgment in his favor was based occurred as he was engaged in his first day's work for appellant. On that day, February 9, 1955, he had commenced work at 8 A.M. Although by profession a sculptor, petitioner's initial work for appellant was in cutting a mold from a block of marble weighing about 300 pounds. The cutting instrument was a chisel powered by a hammer approximately a foot in length and weighing about two pounds operated by compressed air. A foreman of appellant described that a cutter, using such an instrument, would with one hand grip the cutting tool set against the stone and hold the vibrating hammer in the other hand.
*565 Petitioner, testifying that there was vibration from the use of the air hammer, said: "I get shaking, vibration in the arm." He stated that he had been using the hammer steadily during the forenoon; that at about 11:30 A.M. he had "moved" the large block of marble to obtain more light for his work. He states: "I went to the block to move it over to a little light, to have more light, and about one o'clock I started to see black spots in my eye." He described his movement of the marble slab, which was on top of a bench, as follows:
"Q. How did you move it when you moved it? A. Lift it up, move one place to the other.
Q. Well, did you lift it up entirely in your hands? No, to one side.
Q. To one side you moved it? A. Moved it.
Q. Was it easy for you to do? A. No, it was heavy.
Q. Well, all I ask you to do is, in your own words, for you it was heavy. Will you tell the Court in your own words just what you mean by that? A. Well, I had no light where I worked, because it was a mold, a heavy mold, I had no light, I tried to turn to get some light, because it is important to have light to cut down a piece of mold work.
Q. All right. Now, what I want you to do is describe 
The Deputy Director: Was this thing hanging or something?
The Witness: On top of a bench.
The Deputy Director: It was on a bench?
The Witness: Yes, sir.
The Deputy Director: How did you pick it up, move that 300 pounds?
The Witness: Lifting it one side and turn around.
By Mr. Gordon:
Q. Turned around to get light, that is what you are telling us? A. Yes, sir.
Q. What I want you to tell the Court, you say this was heavy, what do you mean by that, just how heavy was it for you to move, tell the Court how you were lifting it, and why you say it was heavy? A. I moved to get the light, it was a heavy piece. Move it to get light because I have no light where I was.
Q. What did you move it with? A. I lift it up with my hand. After a little while lifting it up I start to see black spots in my right eye.
Q. About how long after you moved it did you start to see black spots in front of your eyes?

* * * * * * * *
*566 Q. How long? A. Well, a little while, I don't know how long it was. I saw black spots after a little while I lifted the block. I had no watch with me, to look at a watch.
Q. What time do you go to lunch? A. Twelve o'clock.
Q. Did you see black spots before or after lunch? A. After I lift the block I see black spots.
Q. What I am trying to get at, you say it was a little while after? A. It was 11:30 I lifted the block.
Q. How long after that, do you know how long? A. A little while, ten minutes. I had no watch with me I recall soon as I finished lifting the block I see the black spots.
Q. When you told us before that you saw black spots at one o'clock, what did you mean by that? A. Maybe I see some big  first see little black spots, then after a little while they get bigger.
Q. I see. When you first started to see black spots, was it before you went to lunch? A. When?
Q. You say that this was about 11:30 you lifted this? A. Yes, sir.
Q. And did you say a little while after that you first started to see black spots? A. Very little.
Q. Yes, very little. In the beginning, then, you told us earlier that you went to lunch at twelve o'clock. Did you start to see these black spots for the first time before or after you went to lunch? A. Before.
Q. As the day wore on, did the black spots get any better or worse? A. Worse."
Petitioner further testified that although he worked until the end of his working day at 3:30 P.M. he continued to see "black spots"; that his vision became increasingly impaired. He was unable to work the next day and telephoned appellant's bookkeeper and "told him what happened the day before over there." He has not worked since and has never regained the sight in his right eye. On February 10 he consulted his family doctor, a general practitioner, who thereafter referred him to an ophthalmologist, Dr. Arnold W. Forrest, who saw him the first time on March 18, 1955. Petitioner testified he had not been aware of any eye ailment prior to February 9.
Dr. Forrest testified that the first examination disclosed "light perception vision * * * everything obscured by vitreous hemorrhage in the right eye." He testified that thereafter he examined petitioner's eye on March 24, April 1, April 8, April 22 and May 4, 1955. On the last mentioned *567 day the examination revealed that the vitreous was slightly cleared and there was "a suggestion of retinal tissue below"; that it was then for the first time the doctor was "able to observe the retinal field"; that theretofore the hemorrhage had precluded the examination of the anterior of the eye; that he examined petitioner's eye again on May 13, June 1, June 10 and July 12, 1955. He did not examine petitioner again until December 13, 1957, approximately one week before the aforesaid adjourned hearing in the Division on December 19, 1957. At that time he found that when "dilating the pupils of the right eye there were scattered lens changes, especially the fundus showed retinal detachment with scattered folds, there are three large holes in the lower quarter of the retina." He said that was indicative of "degenerative retina"; that petitioner's condition would not improve and that he was industrially blind.
In response to a hypothetical question Dr. Forrest testified that in his opinion petitioner's eye condition was "caused by the lifting of the marble or the use of the air hammer or both"; that the lifting effort increases the "intravascular pressure and this could certainly result in damage and the patient would then note at varying periods what a layman would describe as spots before his eyes." He continued as follows:
"* * * As time goes on with perhaps using an air hammer, the jostling of the hammer, that would increase the hemorrhage. It was undoubtedly increased with the use of the air hammer. This hemorrhage then clouds, the vision is blurred, the interior of the eye, from the examining physician. As time goes on this hemorrhage may organize, that is, form scar tissue.
Q. Did it remain here in this case? A. There are formations of strands in the fibers and this results in detachment of the retina. It is possible for the detachment to occur early, of course, following the hemorrhage and to exist concurrently with the hemorrhage in the eye. The detachment in the case of this petitioner has resulted in irrevocable industrial blindness in the right eye.
Q. You used the words `It is possible for detachment to occur,' when? A. The hemorrhage when it occurs may be evidenced with the detachment at the same time or may have caused the detachment to occur later on.

*568 * * * * * * * *
Q. Doctor, is a air hammer, a compressed air hammer when vibrating against marble a competent, producing factor of a detached retina or retinal hemorrhage? * * * The Witness: Yes, sir.

* * * * * * * *
By Mr. Hubley:
Q. But, it would be some compression in your opinion toward the man's body? A. I would concede an air hammer, if small, it could not be related to the injury.
Mr. Hubley: That is all.
By Mr. Gordon:
Q. This air hammer Counsel has asked you about, do you know the size of it?
Mr. Hubley: I don't think I have showed it to him.
By Mr. Gordon:
Q. Would you say that the vibration as described by me of both arms when he held it against the marble he was working on, powered by compressed air, would be a competent, producing factor to produce a retinal hemorrhage and detached retina? A. As any other force that results in compression, I think it would be within reasonable medical probability to say the use of an air hammer would produce a detached retina.

* * * * * * * *
By Mr. Hubley:
Q. We are dealing in this case with a direct force as you have stated some other direct force, that the use of the air hammer in this case caused the hemorrhage and detached retina, pressure was by increasing from outside the intraoccular [sic] pressure? A. I believe I said intravascular.
Q. Intravascular. Doctor, in this case as far as the use of this air hammer and drill are concerned, will you explain the mechanism of how it was the use of this brought about a hemorrhage or detached retina?

* * * * * * * *
The Witness: I think the increasing intravascular pressure is related to the retinal hemorrhage. In many patients it is quite possible for vibration induced in the body to precipitate intraoccular [sic] hemorrhage from holding a hammer used to cut marble.
By Mr. Hubley:
Q. What do you mean by, `many patients'? A. It is a reasonable medical possibility, and with this patient, it is a reasonable medical probability that the use of the air hammer to cut marble could produce enough vibration to precipitate a hemorrhage."
An ophthalmologist, Dr. Irving H. Plain, who had examined petitioner on behalf of respondent on September 13, 1955, testified that petitioner, in describing the work which *569 he was performing for respondent on February 9, stated that "he was cutting a mold and had the piece of marble on a pressing machine"; that the only history the witness received from petitioner was "the operation of the air hose or compressing hose"; that he said nothing about lifting or moving a marble slab. The witness testified that his examination of petitioner's eye disclosed the following:
"* * * [T]he crystalline lens at this time was essentially normal, but behind the crystalline lens the entire posterior surface of this eye, this injured eye, was disorganized and detached. There were definite remains of retinal hemorrhage. I also saw what appeared to be peripheral retinal detachment, and the macula area which is the part that controls vision, was involved too. Now, at the nasal mid-portion of the retina there was a rough, reddish-brown area which could have been due either to hemorrhage, detachment of [sic] tumor."
In response to a hypothetical question as to whether or not causal relationship existed between the injury and alleged work-related effort, involved in moving the marble slab and using the air hammer, the doctor testified as follows:
"A. Given this blind eye, from the facts given to me as well as by my examination, I believe it to be caused initially by retinal hemorrhage which he noted in the beginning as small black spots, and as the hemorrhage increased, and this is the usual clinical course, the spots became larger and more noticeable, and when the hemorrhage increased further, his vision was blotted out. I believe that the timely thing here was the retinal hemorrhage which later, as like retinal hemorrhages do, produced a lifting or detachment of the retina. Now, I believe if this man had only worked in using this kind of air hammer in the operation which he described, that the retinal detachment was a spontaneous one. However, if he actually lifted a 300 pound block, that, in itself, might produce a retinal hemorrhage by increasing intraocular pressure to the eye. But, if only this air hose was used I don't believe that is a sufficient producing cause of this retinal hemorrhage.

* * * * * * * *
There is no question but that he had a retinal hemorrhage which apparently began in the morning, according to what I heard here. Did the air hose cause it? I say no. And, I say no because the amount of vibration that would be transmitted to the eye would be infinitesimal for this reason, the eye floats about in a restricted *570 place and it is susceptible in a way, but it is well protected. However, medically, I must say that if he had a beginning hemorrhage I suppose the best thing for him to do would have been to sit down. In other words, I don't say doing any kind of heavy work after the hemorrhage began would be of a tonic nature."
A neurologist, who on behalf of respondent had examined petitioner on September 13, 1955, testified that petitioner said nothing to him about moving the marble slab or using an air hammer while working for respondent on February 9, 1955; he merely stated generally that, while working, "I started to see black spots in front of my right eye. I don't know whether it is a strain or that I hit something. By 3:30 I saw little more black spots." On cross-examination the witness admitted that he did not ask petitioner "what he was doing when he saw black spots in front of his eyes" and he sought no details as to the nature of the work in which petitioner was engaged when his vision was first obscured.
Andrew De Roberto, superintendent of appellant, testified that on February 10, 1955 petitioner telephoned to him that he had to consult his doctor, that he had "spots in front" of his eyes and that in response to an inquiry as to whether he had any trouble with his eyes petitioner answered "I had but quite a while back." The witness made no inquiry of petitioner as to when he first noticed "the spots before his eyes."
On cross-examination the witness, questioned as to when he was first interviewed by anyone with reference to petitioner's claim, testified: "Well I guess about a month after the accident occurred." When pressed, on redirect examination by appellant's lawyer, as to what he meant by the use of the word "accident" the witness replied:
"I generally call that an accident because the man has not come in to work anymore. I mean that this man got his eye hurt or whatever happened he is not coming in to work anymore. When he gets better then he will come back to work."
*571 The bookkeeper at appellant's office testified that he had no knowledge on February 9 of any disability suffered by petitioner; that on February 10 petitioner, in a telephone conversation with the witness, said that "he had something the matter with his eye * * * that he had some injury to his eye and he wouldn't be in to work. He first said he was sick. * * * He was seeing spots before his eyes." The witness gave a negative answer to a question as to whether or not petitioner stated that he "knew of anything that brought about this eye condition."
A job foreman, employed by respondent, and under whose general supervision petitioner worked on February 9, testified that he had no knowledge of anything happening to petitioner on that day. He also testified that the shop was equipped with an overhead crane for lifting the blocks of marble, which varied in size; that he was of the opinion that a block of the size of the one on which petitioner said he had been working "was too heavy to be moved by one man." On cross-examination when pressed as to whether "when you work on a piece of marble on a table do you move it or tip it," he answered: "If he's got to tip it he's got to lift it." When asked whether or not it was impossible to so "handle it * * * by hand," he answered "[t]here is no such thing as impossible!"
The Deputy Director in determining that on the analysis of all of the evidence the petitioner should prevail, expressed the belief that the work on which petitioner was engaged on the day in question including the "shifting" of the block and the "continued use of the hammer" would be at least "a contributing cause" in the occurrence of the hemorrhage and the detachment of the retina.
The County Court reviewed the evidence in detail and, as aforesaid, it too determined that the petitioner had met the "requisite standard of proof" and should prevail.
In our analysis of the evidence we recognize the applicability of certain basic principles which have been established by our decisional law: (a) petitioner bears the *572 burden of proof to justify a compensation award and such award is not sustainable unless the evidence preponderates in favor of the tendered hypothesis. Augustin v. Bank Bldg. and Equipment Corp., 41 N.J. Super. 187 (Cty. Ct. 1956), affirmed 44 N.J. Super. 242 (App. Div. 1957); (b) if under the evidence the tendered hypothesis becomes a rational inference based upon preponderance of probabilities the burden of proof is sustained. Kream v. Public Service Coordinated Transport, 24 N.J. 432, 436 (1957); (c) because of the opportunity which the Deputy Director has to observe the appearance and demeanor of the witnesses we must give due regard to his advantage in judging their credibility. Russo, supra, (26 N.J., at page 435); (d) full and respectful consideration of the views expressed on both fact and law by the Division and the County Court shall be given, Russo, at page 435; (e) in assaying the evidence and determining whether petitioner has borne the burden of proof, "the test is probability rather than certainty," Gilligan v. International Paper Co., 24 N.J. 230, 235 (1957); (f) the decision in each case must necessarily depend on its own particular facts. Mergel v. New Jersey Conveyors Corp., 14 N.J. 609, 613 (1954).
Petitioner's claim of a work-connected injury and its confirmation by the Division and the County Court is assailed by appellant on several grounds. It asserts that petitioner's testimony should be rejected as incredible and charges in its brief that "[t]here is no question but that this claimant willfully, knowingly and intentionally gave false testimony with respect to the material facts of the case." It further states in its brief that the County Court conclusions in favor of petitioner are "in the face of deliberate misstatements, discrepancies and inaccuracies running through petioner's testimony."
We turn to a consideration of the reasons advanced by appellant in support of its position.
A. Appellant contends that plaintiff's use of the word "lift," in testifying that he moved the marble block, describes *573 an impossible act because of the block's weight. A fair reading of the petitioner's testimony justifies the conclusion that petitioner was simply describing a tilting and shifting of the block of marble on the stand on which it rested. Although indubitably such act would require effort and petitioner would have to possess strength for its accomplishment, respondent's foreman, as stated, refused to characterize it as impossible, nor do we under the evidence presented.
B. Skepticism that petitioner suffered a work-connected injury, resulting from any movement of the marble block by him or from vibration of the pneumatic hammer, is expressed by appellant because the description of the accident in the claim petition was limited to the following: "While cutting heavy marble block to make mold, petitioner sustained injuries to right eye." It is noted that such a description is adequate to satisfy pleading requirements under the Workmen's Compensation Act, N.J.S.A. 34:15-1 et seq. Giambattista v. Thomas A. Edison, 32 N.J. Super. 103, 109 (App. Div. 1954). Moreover the fact that the petition did not specify the details of petitioner's work should not result in a rejection of his claim if support thereof is revealed by the testimony. Appellant further asserts that, as petitioner testified that he had advised his counsel of the movement of the marble block, his counsel's omission of the incident in drafting the petition supports the contention that the incident never occurred. Appellant's brief states that petitioner's counsel "admitted that what he included [in the claim petition] was exactly the story given him by his client." The portion of the record, to which appellant directs our attention in this connection, relates merely to a colloquy between petitioner's counsel and appellant's then counsel as to the significance, if any, of an automobile accident in which petitioner had been involved on May 27, 1955 and whether or not petitioner's counsel in July 1955 had asked petitioner whether the latter had been in any accident other than the one at appellant's plant. We find no merit in appellant's contention in this regard.
*574 C. Appellant emphasizes that at the initial hearing on May 2, 1957 petitioner, in describing his work on February 9 preceding the time "spots" appeared in his eye, testified as to the movement of the marble block by him but failed to describe the use of the pneumatic hammer and that the latter evidence was not presented until the next ensuing hearing on December 19, 1957. These circumstances, appellant claims, fortify its assertion that petitioner did not suffer any injury from an "accident" at appellant's plant on February 9, 1955. The evidence however shows that at the initial examination of petitioner by Dr. Forrest petitioner had advised his physician that on the day in question he was using a pneumatic hammer at respondent's plant. Both at oral argument and in his brief petitioner's counsel stated that the omission to develop that phase of the evidence at the initial hearing was due to counsel's oversight.
D. Appellant stresses as significant the fact that when Dr. Forrest, petitioner's treating physician, secured petitioner's history from him, no mention of any movement of the marble block on February 9, 1955 was made by petitioner. However, the record reveals that Dr. Forrest then merely sought information from petitioner as to what he was doing when he "saw these spots." The doctor learned only that petitioner was working with a compressed air hammer and did not pursue the inquiry. He made no inquiry as to when petitioner started working, or what kind of work he was doing prior to 1:30 P.M. on that day or whether earlier that day petitioner had seen black spots, "even small ones." No justification for labelling petitioner's claim as false can be founded on such circumstance.
E. Appellant next says that the falsity of petitioner's claim is evidenced by the fact that Dr. Forrest did not learn until shortly prior to the hearing on December 19, 1957 that petitioner had claimed that, while working on February 9, 1955, he had moved the marble block and had so testified on May 2, 1957; that the doctor's information as to the "lifting" incident came from petitioner's counsel who furnished *575 the doctor with a transcript of the first day's hearing. The doctor frankly stated that when petitioner returned to him for further examination on December 13, 1957 he knew that the compensation claim was being litigated and that he was to be a witness; that prior to the examination he had conferred with petitioner's counsel and had seen the transcript of the first day's hearing. We see nothing in this phase of the case which should label petitioner's story as false. True the petitioner had testified initially that he had seen spots after the "lifting" effort and that he had seen spots while working at 1:30 P.M. after the lunch period, and that they grew worse as the day progressed. This is consistent with what both doctors testify would be the result of the increase of the hemorrhage. The mere fact that petitioner did not tell the doctor specifically about the "lifting" incident at 11:30 A.M. or that he had thereafter noticed some spots in his right eye and that he had seen some spots on that day prior to the 1:30 hour does not destroy his testimony. Petitioner, 51 years of age, in good health and who testified that he had been working all of his life, might easily have failed initially to relate the "lifting" incident to the onset of his symptoms. Certainly he possessed no medical knowledge of the claimed adverse effect which his treating physician later ascribed to the use of the pneumatic hammer and the movement of the marble block.
In dealing with another principle in the Workmen's Compensation field, i.e. that an employer's knowledge of an "injury" suffered by an employee "need not be either of the cause of the injury or of the resultant consequences," Judge Drewen in Layng v. Storch Trucking Co., Inc., 17 N.J. Super. 555 (Cty. Ct. 1952) made an observation which is equally applicable to appellant's point now being considered. Judge Drewen said (at page 560):
"* * * Respondent argues that in addition to its knowledge of the injury it was entitled also to know of the claimed accident, that is the alleged head blow of April 24. If that proposition is valid it means that in the mind of the workman, or other person *576 imparting the knowledge, the two things would have to be associated in something of a cause and effect relation; for otherwise it would never, in all likelihood, occur to the informant, in telling of the sudden blindness, to tell also of what to him was the unrelated and possibly unthought of happening on the day before. The point is that this joining of the two events into a single significance must involve a degree of intellection, however slight, which quite obviously it was never the design of the statute to require. Another way of putting it is to say that if respondent were to carry its point the effect would be, in circumstances like these, to subject the legality of the claim to a test of perceptiveness in the information given the employer, concerning the nature and cause of the injury, a technicality the statute avoids by confining the required knowledge to the injury alone."
F. Appellant emphasizes the fact that petitioner conferred with other physicians in New York, where he resides, prior to his aforesaid initial visit on March 18, 1955 at the office of the specialist, Dr. Forrest, who treated him in the succeeding months; that petitioner's failure to call any of the doctors as claim. He criticizes the County Court's failure to refer to this factor in its opinion. It is to be noted that Dr. Forrest was petitioner's treating physician and in fact was the only treating physician who testified. The record fails to disclose the extent of medical help received by petitioner before March 18, 1955, but it does disclose that the physician who referred petitioner to Dr. Forrest was petitioner's family physician, a general practitioner who apparently considered that petitioner needed the help of a specialist in the indicated field. The fact that the other doctors were not called as witnesses but that petitioner relied only on the medical testimony of the specialist who treated him over an extended period does not in our opinion militate against him.
From an independent study of the entire record, guided by the legal principles above recited, we are satisfied that the petitioner has sustained the burden of proof and is entitled to prevail.
*577 In passing we recognize that where there is a conflict of medical testimony the court will give greater weight to that of the treating physician, Mewes v. Union Bldg. & Construction Co., 45 N.J. Super. 88 (App. Div. 1957), certif. denied 24 N.J. 546 (1957), but the fact is that in the case at bar the medical testimony offered by the respective parties is in accord in many aspects. Each of the doctors is a specialist in ophthalmology and each has extensive hospital and professional connections. They are in agreement that the "lifting" of the block could have produced a detached retina. They differ only in their opinions as to the effect on the retina of the vibration of the hammer operated by compressed air. The basic issue is whether the retinal detachment was a spontaneous one or work-connected. Our consideration of all of the evidence convinces us that it was the latter. The credibility of petitioner is assailed. Appellant alleges that petitioner's testimony reflects a false and fraudulent claim, destructive of his right of recovery. We disagree with this contention.
Affirm.
GAULKIN, J.A.D. (dissenting).
Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958) and Russo v. United States Trucking Corp., 26 N.J. 430 (1958) force me to dissent.
Both the Workmen's Compensation Division and the County Court found in favor of the petitioner. Were the law today as it was thought to be before those cases were decided, I would vote to affirm, because here no "error appears which is so palpable that new findings are necessary in order to insure essential justice"  which was the test under the old "two court rule," as Justice Francis pointed out in his dissent in Ricciardi, at page 461. However, as I understand Ricciardi and Russo, they require the appellate judge "to weigh the evidence and determine whether the claimant has sustained the burden of proof of an accident arising out of and in the course of his employment * * *." Russo, at page 435. When we do that we must, and do, *578 "give due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses," and we consider with care and respect the conclusions of the County Court and of our colleagues, but all that "does not lessen the duty of the appeal court [de novo] to determine the facts and evaluate them by full investigation and analysis of the evidence * * * [and] if upon such total consideration of the record and the views expressed below, it is believed * * * the judgment is erroneous, it should be reversed * * *." Russo, at page 435.
First, as to the Deputy's opportunity to observe the petitioner and judge his credibility, it is to be noted that here we do not have a statement, such as is frequently found in opinions of the Division, that the petitioner and his testimony impressed the Deputy as being forthright and honest. On the contrary, the Deputy found it necessary to explain why he accepted petitioner's story in spite of the poor showing he made on the witness stand. (Incidentally, the County Court was compelled to do likewise.) It is also to be noted that the Deputy did not decide the case until more than four months after he had last seen and heard petitioner, and one wonders whether the impression a witness makes is clear in the mind of a busy Deputy after so long a period. Because of these circumstances, the conclusion of the Deputy to believe the petitioner in spite of the weaknesses, contradictions and evasions in the testimony does not, it seems to me, carry as much weight as it otherwise might.
Turning now to the evidence, we find that petitioner's doctor said that in his opinion the detachment of the retina was "caused by the lifting of the marble or the use of the air hammer or both." When asked, on direct examination, to "detail the basis of that opinion," he replied "A man exerting this upward lift of 300 pounds increases his intravascular pressure and this could certainly result in damage * * *" (emphasis ours). However, I find no testimony of "an upward lift of 300 pounds." In fact, faced with *579 the inherent incredibility of such a lifting, especially when the shop was equipped with mechanical devices for lifting and moving stone, appellant asserted that it was not lifted but shifted by (to use the language of the hypothetical question) "lifting it up and moving it from one place to another, he moved it by lifting up one side of it." Indeed, the Deputy did not find a lifting  he called it "as perhaps shifting the position of the block."
But whether it be lifting or shifting, it does not seem to me that petitioner has proved by the preponderance of the evidence that he did either. Petitioner has been in the stone cutting trade almost 40 years. The inherent improbability of his moving this block of stone by hand, ignoring the mechanical equipment and without asking his fellow workers for help, has already been mentioned. It remains to be pointed out that he never told his doctor, or the employer's doctors, of any moving or shifting episode. That cannot be glossed over by saying he was not aware of its significance or its possible connection with the retinal detachment, for he testified he did tell it to his lawyer. It is not clear whether petitioner asserts that he told his foreman and the plant bookkeeper of the lifting when he telephoned the morning of February 10. If that be his position, then his failure to tell the doctors of the lifting is even more inexplicable. Nor can it be explained away by saying it was not until some time after February 9 that he became aware of the importance of the lifting. Dr. Forrest, who treated him, was not only an expert ophthalmologist but versed in workmen's compensation. He saw petitioner March 18, March 24, April 1, April 8, April 22, May 4, May 13, June 1, June 10 and July 12. Each time Dr. Forrest examined him. Until May 4 Dr. Forrest was trying to determine what was wrong, which necessarily entailed obtaining petitioner's history. On May 4 Dr. Forrest was able to observe for the first time that it was probably a detached retina, a diagnosis subsequently confirmed. He put his findings in writing for transmittal to petitioner's attorneys *580 on May 14, May 31 (addressed to present counsel), and June 8. Petitioner first had a New York attorney, who referred him to present counsel. If petitioner is to be believed, when he saw present counsel for the first time, on July 8, he told him of the lifting, even though he had not mentioned it to the doctor during his numerous visits. Furthermore, he saw Dr. Forrest at least once more after July 8  July 12  and even then he said nothing to him about the lifting.
The excuse offered is that Dr. Forrest did not ask the petitioner about lifting. It seems to me most unlikely that an eye specialist would fail to ask about that, for it was agreed that strain such as lifting is a likely cause of retinal detachment. Respondent's Dr. Plain testified that, precisely because lifting is a likely cause of retinal detachment, he asked petitioner point-blank, when he examined him on September 13, 1955, whether he had been doing any lifting. Petitioner said he had not. Dr. Flicker, a neuropsychiatrist who also examined petitioner on September 13, also testified that when he took petitioner's history petitioner said nothing about lifting or shifting.
As to the vibration of the air hammer, Dr. Forrest said that to cause retinal detachment the vibration would have to be of the entire skeletal framework and not merely of the arms. As the majority opinion points out, petitioner testified that it was his arms that vibrated. Dr. Forrest admitted that "vibration of the bony skeleton by an air hammer used to cut marble is pretty uncommon" and therefore that "an air hammer, if small * * * could not be related to the injury." There is nothing in the record to show what Dr. Forrest meant by "small." Obviously he could not have meant lineal dimensions of the hammer. He must have meant the number and strength of the vibrations produced. That in turn, it seems to me, would depend in large measure upon the amount of pressure of the activating compressed air, yet nowhere in the evidence do I find that the doctor was told what that pressure was, or *581 that he knew anything about the construction, operation or sizes of air compression hammers. In fact petitioner's counsel objected to a question asked of Dr. Forrest on cross-examination on the very ground that "I think the doctor should be advised of the amount of pound pressure behind this hammer when it is being used."
Transcending all this there is here again a peculiar situation, as there was with reference to the lifting. When petitioner first testified, on May 2, 1957, he said absolutely nothing about vibration. The case was then continued to December 19 [sic]. In the interval, about one week before the adjourned date, Dr. Forrest examined the transcript of the testimony taken on May 2, 1957 and discussed it with petitioner's counsel. Up to that point, Dr. Forrest knew nothing about any lifting or shifting. On December 19 Dr. Forrest testified. Petitioner was recalled to the stand and, over the protest of respondent, testified as to the vibration. This is explained in the respondent's brief as follows:
"* * * during the progress of his direct examination * * * [on May 2, petitioner] was emotionally overcome from listening to the colloquy of the counsel and the court, so much so, that petitioner's attorney being anxious to conclude the direct examination for the said reason, completely overlooked bringing out other salient and essential testimony from the petitioner which was necessary * * *."
This explanation seems odd in view of the fact that the testimony taken on May 2 prior to the petitioner's being "emotionally overcome" occupies only 17 pages of the printed transcript whereas, after the petitioner said he wanted no recess and wished to go ahead, 35 more printed pages of testimony were taken.
In short, the petitioner's proofs are so unsatisfactory, and their credibility so impaired and doubtful that I feel he has not proved his case by the necessary preponderance of the evidence, and therefore I would reverse.