72 N.J. Super. 548 (1962)
179 A.2d 25
VAN DOREM JOHNSON, INDIVIDUALLY AND AS GUARDIAN FOR JUNE JOHNSON, JOSEPH JOHNSON, JR. AND MELVIN BROWN, PETITIONER-APPELLANT,
v.
WALTER KIDDE CONSTRUCTORS, INC., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1961.
Decided February 23, 1962.
*549 Before Judges PRICE, SULLIVAN and LEONARD.
Mr. Harry Cohn argued the cause for appellant (Messrs. Harry and George G. Cohn, attorneys).
Mr. Everitt Rhinehart argued the cause for respondent (Mr. John W. Taylor, attorney).
The opinion of the court was delivered by PRICE, S.J.A.D.
June Johnson and Joseph Johnson, Jr., twin infant children of Joseph Johnson, in an appeal prosecuted by their mother Van Dorem Johnson as guardian ad litem, seek to set aside a judgment of the County Court reversing an award of compensation dependency benefits entered in their favor in the Division of Workmen's Compensation as the result of the death of their father, a resident of this State. Johnson v. Walter Kidde Const., Inc., 67 N.J. Super. 406 (Cty. Ct. 1961).
The Division determined that his death on February 10, 1959 resulted from a heart attack suffered by decedent at Idlewild International Airport, Long Island, New York, *550 while he was working there on the previous day as a laborer for respondent Walter Kidde Constructors, Inc. (hereinafter Kidde). Moreover, finding that the attack arose out of and in the course of such employment, and that the employment had its contractual origin in New Jersey, the Division held the death to be compensable.
The mother of the children, who was the "common law wife" of decedent, originally by her petition had also sought compensation benefits for herself and for a minor child Melvin Brown, but the Division had denied both claims. Her individual claim was denied because of her inability to establish a lawful marriage with decedent. The claim of Melvin Brown for compensation benefits, as an alleged statutory dependent of decedent, was denied because the proofs "did not clearly establish" that decedent was his father. The Division determined, however, that the proofs did establish that June Johnson and Joseph Johnson, Jr., aforesaid, were the "natural children of the decedent, * * * were part of his household at the time of his death," and qualified "under R.S. 34:15-13 as total dependents."
On appeal to the County Court Kidde contended that (a) the proofs demonstrated that the contract of employment arose in New York and therefore the Division erred in concluding that it had jurisdiction to make the challenged award; and (b) the heart attack suffered by decedent on February 9, 1959, and his death the following day, were not work-connected but were due solely to pre-existing heart disease.
The County Court made no determination with reference to the latter contention but rested its reversal of the Division's award on the single ground that neither the Division nor it had any jurisdiction of plaintiff's claim because at the time of the aforesaid heart attack "the deceased was in the respondent's employ under a separate and distinct employment agreement entered between the parties in the State of New York." (67 N.J. Super., at p. 409.) However, in resisting petitioner's present appeal from the County *551 Court judgment, respondent not only supports the court's determination that the Division had no jurisdiction of the claim but reiterates its contention that decedent's heart attack and ensuing death were not work-connected. No question of the propriety of the Division's aforesaid determination of dependency is involved on this appeal.
Initially, we consider the jurisdictional question, the aforesaid resolution of which by the County Court is sharply challenged by appellant as wholly unjustified by the proofs and the applicable law. To resolve that issue, as well as the issue of the alleged connection between decedent's employment and his death, hereinafter considered, we have as a reviewing court analyzed the evidence revealed by the record before us in order to make our own determination and evaluation of the facts, giving "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses," and according "full and respectful consideration of the views expressed, on both fact and law, by the Division" and by the County Court. Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958); Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 447-448 (1958); Epps v. Gold, 61 N.J. Super. 355, 362 (App. Div. 1959), affirmed 32 N.J. 344 (1960); Pellegrino v. Monahan McCann Stone Co., 61 N.J. Super. 561, 564 (App. Div. 1959), affirmed 33 N.J. 73 (1960).
We proceed to an assessment of the proofs revealed by the record before us.
Respondent's answers to interrogatories, received in evidence, disclosed that decedent had been employed by respondent in New Jersey for more than a decade preceding February 9, 1959, interrupted only by intervals, usually of short duration, between respondent's construction jobs. The longest interval was approximately six months, the shortest a few hours. Respondent's answers to interrogatories further showed that decedent had first been employed by Kidde on September 11, 1945 and, commencing with employment by it on September 16, 1949 at Bloomfield, N.J. (the earliest *552 date for which it had detailed employee work records available), decedent during the succeeding years had worked in the capacity of a laborer for respondent. The answers also revealed that, with the exception of two successive days in 1949, decedent's work for Kidde during the entire ten-year period, and until the commencement of his Idlewild work on February 2, 1959, had been on construction jobs in New Jersey. Moreover, the record is barren of any proof that during those years decedent had worked for any one other than respondent. The two jobs immediately preceding his work at Idlewild were on major construction projects conducted by respondent at Newark in this State, his work on the latter of those jobs terminating, as disclosed by the testimony of respondent's accountant, on January 21, 1959.
In passing we note that the County Court's opinion contains the statement (67 N.J. Super., at p. 407), that "between the last employment in New Jersey on the Prudential project and his [decedent's] re-employment in New York State, a period of almost two months had elapsed, during which time there was no employment relationship between the parties." A comparable statement was made during the hearing in the Division and also appeared in respondent's answers to interrogatories, in which it was stated that December 12, 1958 was the date of the termination of the New Jersey projects. However, it was finally resolved at the Division hearing that only 12 days, including two Saturdays and two Sundays, intervened between decedent's last day's work at Newark on January 21, 1959 and his initial work at Idlewild on February 2, 1959. We mention the county judge's specific reference to the time interval between the Newark and Idlewild jobs because, although it is apparent that the mistaken reference to that interval was not a controlling factor in his determination, the fact that he emphasized the time interval indicates that he felt it was of some importance.
Allusion should be made to one further phase of the proofs, bearing on decedent's relationship with Kidde, and with *553 reference to which phase extensive testimony was taken in the Division. Petitioner testified that near the end of January 1959 she received a telephone call at her home from someone who, she believed, was a foreman for respondent; that on being advised that decedent was not then at home, the same person again called on the same day, spoke with decedent, and on the "very next Monday" (February 2), decedent left for the Idlewild Airport construction project in company with a co-worker, one General Green, who, with decedent, had been employed by Kidde on the aforesaid Newark projects. There is no dispute that both men commenced their work at Idlewild on that day and that both of them worked there daily until February 9 when Johnson, as stated, suffered the heart attack. Respondent's foreman denied that he had summoned decedent to Idlewild by telephone.
Although not relying on the disputed telephone conversation as the principal basis for his finding that the Division had jurisdiction of petitioner's claim, the judge in compensation held that the evidence justified a finding, which he made, that decedent's aforesaid telephone conversation while at his Newark home (followed by his act in going to Idlewild on Monday, February 2), constituted his acceptance in New Jersey of the job opportunity at Idlewild, thereby fixing the situs of the contract in this State. The County Court made no reference whatever to the foregoing proofs or to the Division's conclusion with reference thereto. On appeal, however, petitioner stresses that evidence and the propriety of the Division's aforesaid finding as an "alternative jurisdictional contention."
As to petitioner's last-mentioned contention we are of the opinion that the finding (made by the judge in compensation) that the employment contract arose in New Jersey as a result of the controverted telephone call, was not sustained by the greater weight of the credible evidence. The record is barren of any competent evidence as to the true identity of the caller (suggested to be respondent's foreman, who *554 categorically denied making the call); there is no evidence of the details of the conversation with decedent; there is not even any proof as to what Johnson allegedly said in that conversation; and the conclusion that he then, in New Jersey, orally accepted employment at Idlewild is purely speculative. Consequently, we find no justification for the Division's determination that the alleged conversation constituted or created a New Jersey contract of employment.
We turn to a consideration of petitioner's primary jurisdictional contention. The specific question presented is whether a laborer who (a) is originally employed in New Jersey by a contractor, (b) works for over ten years for the same contractor on various construction jobs in this State, (c) who, although given a written "termination notice" after the completion of each project or if the employer needs the laborer's service elsewhere, is given such notice before the project's completion, nevertheless has (d) consistently been "re-hired" by the same contractor over the aforesaid span of years with (e) intervals between the jobs limited in many instances to a few days or even a few hours, has established a sufficiently continuous employment relationship with the contractor within the philosophy of our workmen's compensation statute so as to justify the Division's assumption of jurisdiction of an allegedly compensable claim arising from that laborer's work for the same contractor on a New York job at the end of the decade.
In support of her aforesaid contention that the Division had jurisdiction over the instant case, petitioner principally relies upon Bowers v. American Bridge Co., 43 N.J. Super. 48 (App. Div. 1956), affirmed 24 N.J. 390 (1957), and English v. Stokes Molded Products, 43 N.J. Super. 63 (App. Div. 1956).
In Bowers, supra, we had occasion to consider a contention that an employment relationship originating in New Jersey had been terminated and a new one entered into having Pennsylvania as the situs of the contract. Under the facts therein we held that a period of several weeks, *555 during which time petitioner was off the job, did not interrupt the employment relationship. Respondent in Bowers produced evidence that upon petitioner's return to work, he signed "a second employment card." The "second employment card" was accorded little significance by us because "a new card" was "always required under respondent's records system when a man" was "off the payroll over a week." (43 N.J. Super., at pp. 56-57).
In English v. Stokes Molded Products, supra, we held that there had been no interruption of a New Jersey employment relationship, but rather a continuous employment of petitioner by respondent even after petitioner had commenced work at a location in Pennsylvania. Petitioner had been working for respondent in this State until Saturday or Sunday, April 12 or 13, and began work for respondent in Pennsylvania on Monday, April 14. In concluding that the Division had jurisdiction we observed that:
"* * * Self-serving records of the respondent, which may or may not have been devised for the very purpose of terminating respondent's compensation liability in New Jersey, cannot establish a layoff of petitioner in the absence of any proof that he was advised thereof and in the face of his flat denial and of his credible and unrefuted account of the circumstances of his transfer." (43 N.J. Super., at p. 73.)
We there recognized and applied the principle "that a layoff accompanied by an understanding of resumption or `re-employment' would not effectively terminate the employment relationship." (43 N.J. Super., at pp. 74-75.) Also of significance to the case at bar is the further principle, enunciated in English, supra, at p. 75, that "Even the execution of a form of new contract will not dissuade" us "from looking into the substance of a transaction in order to determine whether the relationship was not essentially one continuous employment."
The principal ground on which the Division rested its finding that the challenge to its jurisdiction was not well taken was that decedent's employment by respondent was a *556 continuing relationship. The finding was expressed by the judge in compensation in part as follows:
"The jurisdiction of the Workmen's Compensation Division to make an award for disability or death resulting from a work-connected out-of-state accident, where the work was being done pursuant to an employment contract made in New Jersey, is well established under our adjudications. Here the preponderance of the evidence points to a New Jersey contract of employment entered into by the deceased and the respondent many years ago, and a more-or-less continuous course of work pursuant thereto with relatively short intervals between the various construction jobs. * * *"
Reference was also made by the judge in compensation to printed "employment application" forms which, the evidence showed, Kidde required workmen to sign as they commenced work on a project. One of these, signed by decedent the morning of February 2, 1959, for the commencement of his work on the Idlewild project, was received in evidence. It was captioned "Employment Application (Field Work)," with information as to decedent's age, permanent address, etc. It listed the date of employment as "2-2-59," the job number, and the "Starting Rate" of hourly pay at $3.45. At the top of the particular blank the word "Rehire" was written in longhand. With the exception of decedent's signature, which he had placed in the portion of the form designated therefor, the information thereon had been completed by respondent's timekeeper after decedent signed, and apparently from information readily available to Kidde from earlier applications of decedent.
The judge in compensation, holding that the aforesaid application forms were not controlling in determining the situs of the contractual relationship, expressed himself as follows:
"* * * The self-serving employment application forms required by the respondent for each job appear to be a convenience or aid to the respondent in its cost accounting procedure, rather than a new contract of hiring. Where the evidence indicates that the relationship was essentially one of continuous employment, the mere execution of a form of a new contract will not dissuade the Court from looking into the substance of the transaction in order to determine the relationship between the parties."
*557 On this phase of the case the Division held that "from all the evidence at hand" the conclusion was warranted that "the decedent on the day he suffered his fatal heart attack was performing work for the respondent in the State of New York pursuant to a contract of employment entered into in the State of New Jersey."
In sharp contrast, the County Court, determining that the Division was without jurisdiction to entertain petitioner's claim, held that the "issue involves a mixed legal and factual question of the situs of the employment contract between the parties." It observed that "as each project ended, the employment was formally terminated by written notice" (67 N.J. Super., at p. 407), and that "to obtain re-employment as to each project, the deceased was required to make written application for the same and the respondent was under no obligation to re-employ the decedent" (at p. 407); that there was "no express, implied or tacit understanding or agreement of re-employment, nor even the right of any priority re-employment" (at p. 408). Determining that the intent of the parties was evidenced by the written forms, the court found, as heretofore stated, that at the time of decedent's heart attack on February 9 he was in Kidde's employ under a contract entered into in New York State (at p. 409).
On the basis of the record, which we have independently examined and assayed, we conclude that ample justification exists for a finding, which we make, that respondent's use of "termination" and "employment application" forms of the type here disclosed in connection with the employment of laborers on successive construction projects is not determinative of the contractual relationship existing between Kidde and decedent. We are concerned with the substance rather than with the form of that relationship. The evidence, in our opinion, adequately justifies the inference that during the years of employment relationship a tacit understanding of decedent's employment on respondent's future projects existed. The "employment application" form dated February 2, 1959, and received in evidence as aforesaid, *558 is most sketchy. It is noted that under the heading "Former Employers" appear spaces, in numerical sequence for the insertion of three names, addresses, reasons for leaving, kinds of work, dates and rates of pay. The only information in that section which respondent's timekeeper had inserted on the February 2 form signed by decedent was "Walter Kidde Const.  Newark Job."
When consideration is given to the fact that the initial employment of decedent in New Jersey was followed, as above outlined, by work on respondent's various projects in this State over a decade, we are convinced that in essence the contractual relationship between respondent and decedent had its true situs in New Jersey. It is unrealistic to deny this State's jurisdiction to act on petitioner's compensation claim allegedly arising out of the Idlewild project solely because on February 2, 1959 respondent, in line with its usual practice, required that decedent sign an "employment application" form, or that respondent had given decedent a "termination" notice when he ceased his work at the site of the latter of the two Newark projects on which he had been employed immediately before going to Idlewild.
In resolving this issue it is important to note the pattern pursued by respondent in hiring decedent for work on various building projects over the years. As heretofore observed, the earlier detailed employment records are no longer available, but the testimony of respondent's accountant shows that the initial employment of decedent on September 11, 1945 was at Clifton, N.J., and that during successive years, to and including the February 1959 Idlewild job, decedent's services were utilized by respondent to the extent that his overall employment covered 25 work periods (he occasionally worked on the same construction project for more than one period). Since 1949 (from which time, as above noted, detailed work records are available), decedent had been employed by respondent for 20 work periods, of which all involved employment in New Jersey except one of two days duration in New York in 1949, and *559 the other the Idlewild job under scrutiny. In view of the foregoing, respondent's practice of giving "termination" notices and requiring "employment applications" with reference to the various building projects loses its significance. Undoubtedly the extent of the work-demands of each job, as well as seasonal requirements, dictated the number of laborers employed by respondent and the identity of those selected for the respective jobs which respondent would simultaneously be prosecuting in various areas. Such considerations undoubtedly controlled the cessation and resumption of work by decedent for respondent. The judge in compensation considered that the practice followed "strongly suggests timely lay off, accompanied by an understanding of resumption on the next job." We agree. Furthermore, the fact that the rate of pay on various jobs would vary, and the fact that the jurisdiction of different local unions might be involved, both of which elements are stressed by respondent as significant in support of the separate and distinct contract theory it espouses, are of no controlling significance. Decedent apparently was one of respondent's key laborers, and the proofs fully justify the inference that his reliability and the quality of his work were the factors which account for his retention on successive projects over the years. The facts that the rate of pay might vary with the project locations, and that a local union's consent for decedent's work in a particular area had to be obtained (as was done in New York), were existing circumstances which, however, cannot destroy the continuity of the employer-employee relationship or even adversely affect it. During the entire period, decedent's job classification, title and duties remained the same.
The County Court held (67 N.J. Super., at p. 408) that the employment of decedent by Kidde over the years was represented by "separate and independent contracts of re-employment with every new project," and stressed the existence of the "termination" and "employment application" forms aforesaid. It concluded that the factual differences *560 existing between the case at bar and the Bowers and English cases, supra, rendered those cases inapposite. It said (at p. 409): "None of the cases indicate any definite and express formal termination and formal written re-employment, to the knowledge of both parties." It is true that the facts in the cited cases vary from those in the case at bar, but the principles enunciated in English are of critical significance in reaching a correct solution of the present issue. We repeat the holding expressed by us therein (43 N.J. Super., at p. 79) as follows:
"The modifications of the hiring were only in respect of matters incidental to the basic employment relationship and did not supersede it so as to obviate the applicability of New Jersey compensation laws or to oust the jurisdiction of New Jersey tribunals to grant an award for a subsequent accident arising out of the employment."
The factual background revealed by the record before us renders the foregoing quotation equally pertinent in disposing of the issue raised by this appeal. Again we emphasize the importance of probing the substance of the relationship between respondent and decedent. So doing, we arrive at the definite conclusion that the notices of "termination" and the "employment applications" should not so dominate that relationship as to prevent "vesting compensation jurisdiction in local tribunals." (English, at p. 75).
We pass now to a consideration of petitioner's contention that Johnson's death was causatively related to his employment. The judge in compensation so determined. The County Court specifically refrained from deciding the issue as that tribunal's reversal of the award in the Division was based, as above noted, solely on its conclusion that this State lacked jurisdiction of the claim.
The record before us reveals sharp testimonial disagreement as to the work done by Johnson on the morning of February 9 at Idlewild. According to the co-worker Green, *561 Johnson and he arrived at Idlewild about 7:30 A.M. and, after "checking in," commenced work at 8:00 A.M. Green further testified that he and Johnson had jointly carried two large exceedingly heavy "forms" over rough terrain a distance of approximately 45 feet, from the interior of a hangar to a point on the job site where they were to be used; that as Johnson reached for a rope to be used in connection with hoisting the forms incident to the building construction, Johnson "grabbed his stomach," gave evidence of acute illness, and complained of pain in his chest and abdomen. He said that Johnson immediately ceased work, went to the timekeeper's "shanty," approximately 150 feet distant, to seek relief for what he felt was an attack of "indigestion." He was there given two aspirin tablets. Johnson later, Green said, emerged from the shanty to return to the job but was unable to do so. He appeared acutely ill, was removed to the office of a physician, Dr. Louis C. Abelson, and from there to St. Joseph's Hospital.
In contrast with plaintiff's proofs, respondent's foreman testified that Johnson performed no work on February 9 at Idlewild; that shortly after Johnson's arrival at the job site he complained of "indigestion" and became so ill that he was unable to undertake any physical labor.
The judge in compensation, who had the opportunity to hear the witnesses, concluded that on that day work had been performed by Johnson at the job site for a period of 15 to 20 minutes immediately following 8:00 A.M., and that the work was of the laborious nature outlined by Green. The Division judge stated that he was "constrained to accept the testimony of the witness Green as being more credible upon this important aspect." He explained his reasons therefor (a procedure with reference to which this court has voiced its approval, Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 287 (App. Div. 1958)). He stated that two areas of the proofs fortified his conclusion: (a) testimony by respondent's "field accountant" as to the time Johnson arrived at the shanty, which coincided with Green's *562 testimony as to when "decedent had to stop work" and seek aid there; and (b) respondent's answer to an interrogatory, to which the judge in compensation referred in his opinion as follows:
"* * * In the sworn Answers [to interrogatories], the respondent stated that the petitioner stopped work at 8:10 A.M., and that he had prior to stopping `tied a rope around a 2 by 14 by 14 inches.' This is in direct contradiction of Rinaldi's [the foreman's] testimony * * *."
Determining, as we do, that the fact that Johnson had performed work on the morning of the attack was established by the preponderance of the evidence, we find ample justification in the evidence for the further conclusion that his death was accelerated and hastened by the work effort imposed on a pre-existing arteriosclerotic condition.
The physician, Dr. Abelson, made a clinical diagnosis of an acute myocardial infarction while Johnson was at his office. By the doctor's direction, on Johnson's admission to the hospital, an electrocardiogram was taken which revealed "extensive subindocardial infarction." Johnson died the next day. The hospital record contains the following statement: "Patient admitted to this hospital complaining of severe chest pain (anterior chest) since early this morning." An autopsy was performed which confirmed the above diagnosis. The anatomical diagnosis is set forth in the hospital record as follows:
"I Acute myocardial infarction
A. Acute pulmonary edema and congestion
II Generalized arteriosclerosis
A. Coronary arteries
B. Aorta
III Aneurysms of both common iliac arteries with adherent thrombi."
The pathologist found that the lumen of the "left anterior descending artery" was reduced to "a pinpoint narrow slit in some areas."
*563 The record before us reveals that petitioner testified that decedent regularly took "Tums," a proprietary medicine frequently used to relieve attacks of indigestion; that he "carried" the "tablets * * * with him * * * most of the time"; that he frequently took them "with his coffee" and had used them at breakfast on the morning of February 9.
We find it unnecessary to review the medical proofs in detail. There was no dispute that the cause of death was "acute myocardial infarction." Moreover, in view of the evidence there can be no serious controversy that decedent was suffering from generalized arteriosclerosis. We have no difficulty in concluding, as did the judge in compensation, that the decedent's morning work, even though it covered a comparatively brief time-span, was a contributing factor in his ensuing heart attack and subsequent death.
We note that the hypothetical question propounded to respondent's expert medical witness on direct examination failed to include a recital that any significant work effort was expended by decedent following the 8:00 o'clock starting time for work on February 9, at the Idlewild project. However, when on cross-examination the doctor was asked to assume that decedent on that morning following 8:00 o'clock had, with Green, lifted and carried heavy forms over the rough terrain, he stated that although he believed it improbable, he would, on the foregoing assumption concede that there was "a possibility of aggravation" resulting from the work.
We determine that petitioner has sustained "the burden of showing by the preponderance of the believable evidence" that the work effort, which we find Johnson expended, "in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom." Dwyer v. Ford Motor Co., 36 N.J. 487 (1962).
The judgment of the County Court is reversed and the award in the Division reinstated.