66 N.J. Super. 469 (1961)
169 A.2d 499
RUTH DWYER, PETITIONER-APPELLANT,
v.
FORD MOTOR COMPANY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 13, 1961.
Decided March 30, 1961.
*471 Before Judges GOLDMANN, FOLEY and COLLESTER.
Mr. Aaron Gordon argued the cause for appellant (Messrs. Hirschberg, Nashel, Zorn & Cronson, attorneys).
Mr. Verling C. Enteman argued the cause for respondent (Messrs. McCarter & English, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
This is an appeal by a widow of a deceased employee of respondent, from a judgment of the County Court dismissing her claim petition for dependency compensation for the benefit of herself and her four minor children. The claim petition sought compensation for decedent's death as a result of a heart attack alleged to have arisen out of and in the course of his employment by respondent. The judgment of the County Court affirmed a judgment of dismissal in the Division of Workmen's Compensation.
It is contended that the petitioner established by a preponderance of the probabilities that the duties of the employment operated as a contributing cause to the death of her husband, but for which it would not have occurred.
The case turns on a determination of which of two conflicting medical opinions is supported by the preponderance of probabilities. While the essential facts upon which these opinions were based are not in dispute, nevertheless, it is necessary that such facts be recited at some length if our *472 evaluation of the weight of the respective opinions is to be fully understood.
The decedent, who was 41 years of age, had been employed by respondent for seven years. He had been in good health until 1953 when he consulted his family physician because of a pain in his left shoulder. This underlying condition was diagnosed as a subdeltoid bursitis. In May of 1956 he began having pains in his chest, his left arm "went dead," his left hand became numb and he suffered from indigestion and diarrhea. On June 12, 1956 he entered Christ Hospital in Jersey City, where he was treated by a cardiologist for 18 days. Electrocardiograms taken during the hospitalization were not significant. The diagnosis made on discharge was "Arthritis (rheumatoid) angina pectoris." It was then stated that his condition was very much improved. Following the confinement in Christ Hospital he stayed at home for three weeks and then returned to work.
On December 6, 1956 he again consulted his family physician and complained of a pain across the chest which radiated to his left arm. The physician examined him and took electro-cardiograms which indicated no significant abnormality. A diagnosis was made of coronary insufficiency, and the medication prescribed was "in the nature of vasodilators."
On February 11, 1957 the same physician was called to decedent's home and found him complaining of pains across the chest. Again the diagnosis was coronary insufficiency and the same medication was prescribed.
On Sunday, April 27, 1958, while at home and shortly before lunch, decedent found that he "could hardly breathe"; had a "terrible pain" in his left arm and hand; "went cold"; "sweat poured from him," and he "just could not get any air." In a telephone conversation, his physician prescribed nitroglycerin pills which he was directed to put under his tongue. The pain continued throughout the day. He remained at home on April 28 and was visited by his doctor who examined him, again diagnosed the condition as coronary insufficiency, and renewed the prescription of nitroglycerin pills.
*473 On April 29 decedent's wife telephoned the physician and discussed the advisability of decedent's going to work that day. She was told by the doctor that he could go to work but that he should refrain from "heavy lifting and pushing and work of that nature." On that morning decedent was very pale as compared with his usual ruddy complexion. He was fatigued and drawn and although he was a big man in physical stature and appearance and  as his wife put it, "a big eater"  he did not eat the prepared meal. That afternoon he drove from his home in West New York to respondent's plant in Mahwah, New Jersey, taking with him the nitroglycerin pills and a lunch consisting of a sandwich and a piece of cake. He was accompanied by four or more fellow workmen, two of whom he picked up in West New York and the others en route to Mahwah.
In the course of the drive decedent placed a nitroglycerin pill under his tongue. A fellow workman testified that he "did not look good," that he "looked sick while in the car and was a little pale." He commenced his work by lining up a barrel filled with grenadine chemical which would later be substituted for one then in place on the bonderizing machine. Because of its weight and bulk and its position on a stand three or four feet above the floor, it had to be lifted by him with a steel chain block and fall. The apparatus had two hooks on each side and decedent after hooking up the barrel lifted it by means of the block and fall. Following this operation it was noticed that decedent was "puffing." A fellow workman testified that decedent had never "puffed" before, that his "complexion was white and strained and he looked like he was slowing up." At about 6:30 P.M. decedent removed the grenadine barrel which had been emptied, slackened the chain of the block and fall and pushed the barrel into position on the stand. It was testified that at that time, he looked extra tired, "like a sad sack," and "worse than when he came to work about 3 P.M." After a "coffee break" he pushed a hand truck *474 down an aisle for about 250 feet and placed on it another barrel of the same size as the one he had previously handled and then pushed the hand truck back to his station. A "lunch break" was taken at 7:45 P.M. Decedent did not eat his lunch and again took a nitroglycerin pill. At about 10:30 P.M. he moved another filled chemical barrel, rolling it a distance of some 15 or 20 feet. In addition to the work referred to, decedent also bent metal wire into hooks. Each of these weighed about three-quarters of a pound. When he had accumulated 50 or 60 pounds of hooks he put them in boxes and carried them 100 to 150 feet where they were to be used. His shift ended at 11:45 P.M. and he drove his fellow workmen home. On the way he took another nitroglycerin pill. Upon his arrival at home he was in such great pain his family physician was called. The latter was not available, and shortly thereafter the West New York police ambulance came and removed decedent to the North Hudson Hospital. Upon his arrival an electrocardiogram was made which revealed an acute coronary occlusion with posterior wall infarction. He was given emergency treatment but died shortly thereafter, the cause of death being certified as "coronary thrombosis, coronary sclerosis."
Upon this hypothesis petitioner's Dr. Saul Lieb concluded that the duties performed by decedent in the course of his employment were a "major contributing factor" in his death. It was this doctor's opinion that the onset of coronary insufficiency first appeared in May 1956 and that recurrences of the symptoms of the same had taken place on December 6, 1956, February 11, 1957 and on April 27, 1958, when he had a "fairly severe attack" of coronary insufficiency manifested by symptoms that he could "hardly breathe," "he sweated," that "he had this terrible pain in his left arm and hand" and "could not get air"; that starting on this date he had a "spontaneous worsening of his pre-existing coronary disease," that he should not have worked on April 29, and that the work he did that day *475 increased the coronary insufficiency to the extent that it was productive of an acute myocardial infarction which resulted in death. The doctor admitted, however, that a prolonged attack of coronary insufficiency can, of itself, produce myocardial infarction and he further diluted the force of his opinion by his testimony that "if a man does this type of work in the midst of an attack of acute coronary insufficiency it must be considered to have a deleterious effect." This begs the crucial question of whether the "deleterious effect" so aggravated the pre-existing malady as to have hastened decedent's death. Viewing Doctor Lieb's testimony in its entirety, it appears that he clings to a view which he has expressed, and which we have rejected in prior cases as a basis for a compensation award, namely, that if a workman afflicted by a diseased heart suffers a heart attack while working, necessarily it must be concluded that the work effort contributed to the attack regardless of the degree of exertion involved therein or the extent of the pre-existing cardiovascular disease. See Black v. Mahoney Troast Construction Co., 65 N.J. Super. 397 (App. Div. 1961); Jacobs v. Kaplan, 56 N.J. Super. 157 (App. Div. 1959). This is not the law and cannot become the law unless we are willing to depart from the sound concept, frequently stated, that employment and accident are not synonymous.
Doctor Jerome Kaufman testified for respondent upon the same hypothesis. He reiterated the view that in 1956 decedent developed symptoms of rheumatoid arthritis and coronary sclerosis with coronary insufficiency known as angina pectoris; that he had a recurrent attack in 1957 and on April 27, 1958 commenced having a severe attack of coronary insufficiency which persisted until his death. The doctor ruled out the employment as a contributing factor since all of the symptoms of the fatal attack commenced before the work of April 29 began and there was no history of a stress or strain suffered in the course of such work which would permit the conclusion that the work *476 effort was productive of symptomatology which decedent had not already experienced. In short, it was Dr. Kaufman's opinion that decedent's demise was solely the result of the prolonged attack which had started on April 27.
In denying compensation the deputy director and the County Court judge found the medical theory projected by the respondent to be the more probable one. Our independent consideration of the entire record leads us to the same result.
However, the lower tribunals laid considerable stress upon Jacobs v. Kaplan, supra. In the interest of clarity we think it proper to state that we find that case to be factually inapposite. In Jacobs we were dealing with a situation where admittedly the petitioner's employment duties preceding the heart attack involved no effort greater than the stresses or strains of ordinary living. Concededly there was no identifiable work-connected incident which preceded or accompanied the onset of this attack. Rather, it appeared without contradiction that petitioner's cardiovascular system had gradually deteriorated over a lengthy period of time to the point where any effort however slight, even the exertion required to stay alive, was capable of producing the attack. In these circumstances we concluded that the granting of compensation in effect would have been to equate the word "accident" to the word "employment" and would have offended the established principle that to render an injury compensable there must be an event or happning beyond the mere employment itself which brings about the final result or contributes thereto and without which the injury would not have been suffered. Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156, 160 (Sup. Ct. 1946), affirmed 135 N.J.L. 352 (E. & A. 1947). A similar factual complex obtained in Black v. Mahoney Troast Construction Co., supra, in which we also denied compensation. See also Loew v. Borough of Union Beach, 56 N.J. Super. 93 (App. Div. 1959), certification denied 31 N.J. 75 (1959).
*477 But here decedent's work efforts were of a somewhat laborious nature and certainly not those to be contemplated as the "ordinary stresses and strains" of daily life even though they were "usual" to him. So, if the exertions attending the work performed by decedent on April 29 contributed to his death, compensation should be allowed since it is no longer necessary that an unusual strain be proved. Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127, 138 (1958). However, it is in this very respect that petitioner's proof failed. There was not only a lack of evidence of a specific work-connected event or happening beyond the mere employment, but more importantly, the facts of this particular case permit of no inference that but for the work performed by decedent on April 29 he would not have died when he did and as he did.
Nor is this a case such as Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13 (App. Div. 1960), certification denied 34 N.J. 67 (1961), where we found that the cerebral hemorrhage suffered by petitioner climaxed his subjection to tensions and strains which inhered in his employment duties over a lengthy period. In the case sub judice we are concerned only with decedent's work efforts of April 29 and their effect, if any, on his progressively deteriorating cardiovascular mechanisms.
It is presumed that death from heart disease is the result of natural physiological causes and the onus is upon a claimant to prove by a preponderance of probabilities that the employment was at least a contributing cause of the death. Ciuba, supra. To overcome this presumption petitioner must present evidence which establishes "the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind." Id., 27 N.J., at page 140. "The accepted standard of persuasion is that the determination be probably based on truth." Ibid. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion and the measure of *478 its weight is the feeling of probability which it engenders. Ibid.
Assayed by these standards we are convinced that whatever decedent may have done in the course of his employment on April 29, it had not the slightest connection with his death. On the contrary, we are satisfied beyond question that the physiological damage resulting from the severe heart attack he suffered on April 27, and which continued thereafter without interruption or abatement, was the sole cause of decedent's demise. Each case, of course, must be adjudged upon its own set of facts. In this case we conclude that not only was the presumption hereinabove referred to not overcome, but every intendment of the evidence tended to strengthen it to the point where in rational thinking it became irrefutable. See Tritschler v. Merck & Company, 66 N.J. Super. 116 (App. Div. 1961).
Affirmed.