68 N.J. Super. 160 (1961)
172 A.2d 1
VIRGINIA BURKLEY, PETITIONER-APPELLANT,
v.
CITY OF ATLANTIC CITY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1961.
Decided June 13, 1961.
*162 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Alexander K. Blatt argued the cause for appellant.
Mr. Harry Miller argued the cause for respondent.
The opinion of the court was delivered by KILKENNY, J.A.D.
This is a workmen's compensation "heart" case, brought pursuant to R.S. 34:15-7 et seq. The Division of Workmen's Compensation made an award of the statutory dependency benefits in favor of the widow and two minor children of the deceased employee. The County Court reversed, set aside the award, and dismissed the claim petition. On this appeal, we must resolve the conflict between the Division and the County Court. There had been an earlier hearing in the Division in this matter, but on appeal to the County Court the case was remanded to the Division for a rehearing because of certain actions by the *163 Director who conducted the first hearing, which do not affect the substance of questions involved in the present appeal.
Frank Burkley, 36 years old, husband of the petitioner and father of their two children, had been employed by the City of Atlantic City as a paid fireman from 1949 to September 2, 1956. On that day, while washing down the walls of a toilet room in the firehouse, pursuant to directions of his captain, Burkley collapsed on the job at about 5:40 P.M. and was rushed therefrom to Atlantic City Hospital, where he was pronounced dead on arrival at 5:55 P.M.
Burkley's tour of duty that day was from 8:00 A.M. to 6:00 P.M. He left home for work that morning at 7:45 A.M. He had been suffering from a cold for about two weeks prior thereto, for which he took aspirin and cold tablets. He was perspiring and "appeared rather weak" that morning when he left, according to his wife's testimony. The record is barren of any prior medical history, or of any awareness by Burkley of any present or previous heart ailment. He had received no medical attention for the cold or for any cardiac condition. He worked that morning and through the early afternoon at the firehouse in the performance of his duties without incident or complaint of any kind. Classified as a pumper operator, Burkley was required to operate, clean and polish the pumper apparatus, in addition to his general duties as a fireman, such as attending fires, climbing ladders, and the cleaning chores in and about the firehouse.
About 4:45 P.M., Captain McMenamin, decedent's superior, noticed that toilet paper was strewn on the floor of the toilet room in the firehouse. Also, there was some liquid, with the appearance of coca-cola, "splattered" on the wall of the toilet room "in several spots," about eight or nine feet up, running down in streaks toward the floor, and covering an area of three or four feet in width. This portion of the toilet room is partitioned off from the urinals and the rest of the room. There was a window in the room, but it was closed. The wall was constructed of plaster painted *164 yellow and "rough in spots." The ceiling was 12 feet high. There was a commode in the toilet room about 20 inches high.
About 4:55 P.M., Captain McMenamin assigned Burkley to clean this toilet room. About 5:40 P.M., as the captain passed the room, he observed Burkley standing on the toilet-seat cover with a cloth in his right hand and with his right arm extended to its fullest length over his head, wiping down the wall. This observation took "a matter of seconds." Shortly thereafter a thud was heard and the captain and other firemen ran to the room and found Burkley lying unconscious, face down, on the floor, with his head near the entrance door and his feet towards the toilet. Some perspiration was observed on his forehead, but there was no objective evidence of physical injury.
The walls of the toilet room were infrequently washed and were generally broomed down. In fact, this was a special assignment and not a matter of routine. The captain testified that ordinarily men were not required to stand on the toilet seat and to reach overhead to clean the walls of the toilet room; and, in fact, this was the first time it was done in that way, so far as he knew.
There is no evidence as to precisely when the decedent began the assignment given to him at 4:55 P.M., or precisely how long he was engaged in the work operation, except that we know that he was washing the wall in the manner described by the captain immediately prior to hearing the thud and discovery of Burkley's body lying prone on the floor. However, most of the wall had been cleaned by that time, so that a considerable part, if not all, of the time interval between the assignment at 4:55 P.M. and the collapse at 5:40 P.M. may be inferred to have probably been devoted to this work effort.
At 7:30 P.M., Dr. Petinga, a general practitioner and County Physician, who had performed close to 500 autopsies since 1948, viewed the body and found it to be cyanotic from the neck up. Eighteen hours later he performed an autopsy and reported the cause of death as "acute coronary occlusion. *165 coronary artery disease." He found "the coronary arteries were sclerosed throughout with some decrease in lumen size, * * * Just beyond the osteum of the left coronary as it arises from the aorta is a roughened, jagged area of coronary wall and in this plaque is some accumulation of blood (probably early thrombosis)." Testifying for petitioner, in answer to a hypothetical question which incorporated the facts and his own autopsy findings, Dr. Petinga expressed the opinion that the work Burkley was doing at the time was causally connected with his collapse and death. When asked for his reasons, he stated:
"Well, the fact that he climbed on the toilet seat and he was stretching to clean an area above his head, plus the fact that the wall is a roughened surface which required more effort on the part of anyone with this condition to clean, and the fact that the streaks were due to a sirupy liquid which is very hard to remove normally; taking those facts into consideration with the findings on the autopsy, I felt that this act was sufficient enough to cause him to have a fatal coronary."
Dr. Petinga expressed the view that the work that Burkley was doing was a contributing factor in aggravating or accelerating his pre-existing coronary condition as shown in the autopsy report; that Burkley's exertions and strain while standing on the toilet seat under the circumstances then and there existing were a precipitating factor that made his heart succumb; and that by reason of his coronary condition indicating a narrowing of the arteries, the heart action was speeded up causing a more forceful flow of blood and a greater demand for a blood supply through the coronary arteries. Dr. Petinga excluded the possibility of a coronary earlier in the day because if such had occurred "it would have shown more evidence on the autopsy than I found. * * * In this way: The coronary occlusion would have been firm, would have been more attached to the coronary vessel and in addition to that he would have had to start complaining of some chest pain because of exertion or the eschemia that is associated with the cutting off of the blood *166 supply, plus the fact that the muscle would have shown to have been depleted of some circulation or nourishment which go along with an occlusion that had been of some period or time element." Thus Dr. Petinga concluded that the precipitating cause of Burkley's collapse was the exertion expended in cleaning this wall.
Dr. Levi Walker, a specialist in cardio-vascular diseases, also testified for petitioner and supported Dr. Petinga's opinion that there was a causal relationship between the work which the decedent was doing immediately prior to his collapse and his sudden heart failure and death. At the first hearing of this matter, Dr. Walker had based his opinion on the assumption that the autopsy report revealed a loosening of the plaque. After the testimony of Dr. Petinga at the second hearing in which it became evident that this assumption was not correct, Dr. Walker persisted in his conclusion that a causal relationship existed between the work effort and the fatal collapse. He found from the ante-mortem accumulation of blood noted in the autopsy report an inference that perhaps "a blood clot had formed." He then opined:
"It doesn't make any difference whether the destruction was caused by a blood clot or by a loosening plaque. Anything which obstructs or causes the obstruction of the flow of blood through an already damaged arterio supply to the heart, it would be sufficient to produce this man's condition."
Dr. Walker conceded that ventricular fibrillation can cause death and from an autopsy standpoint that condition cannot be ascertained pathologically. While testifying that it is entirely "probable" that this man died of ventricular fibrillation due to impaired condition of his heart muscle, it seems obvious to this court from his over-all testimony that the use of the word "probable" was unintentionally substituted for the word "possible," the latter being a more normal idiomatic usage in this context. Dr. Walker's final opinion was that the cause of death was acute myocardial insufficiency caused either by a loosening plaque or a thrombotic *167 episode occurring at the site of the plaque. When the Deputy Director finally put to Dr. Walker what he described as "the $64 question" as to what was his well considered opinion as to the reasonable probability of Burkley's collapsing when he did, the doctor's answer was:
"My opinion about that, your Honor, is that he was exerting himself at that time to a sufficient degree that he was not getting enough blood supply to his heart muscles to give the adequate nourishment. * * * He had been standing on a toilet seat and he had been scrubbing a rather rough wall to remove stains from it and he was reaching as high as he could and I believe it (the hypothetical question) also states that it was a hot day and he was in an enclosed room."
Dr. James Gleason, also a specialist in cardio-vascular diseases, testified for respondent and stated that there was nothing in the autopsy report to indicate that death was due to a coronary occlusion. It was his opinion that Burkley's death was due to ventricular fibrillation produced by the pre-existing coronary artery disease. In Dr. Gleason's view, the work being performed by Burkley immediately prior to his collapse did not cause, contribute to, or accelerate his death.
Dr. Louis Soloff, a heart specialist and pathologist, likewise testified on behalf of the respondent that there was nothing in the autopsy report that justified the conclusion of a coronary occlusion. In his opinion, the work being performed by Burkley had no relationship to his death. He gave as his reasons therefor that Burkley had made no previous complaints with reference to his heart; that he had previously done more taxing work than cleaning a wall; that there wasn't any unusual and sustained physical effort to which his collapse and death could be attributed; that there was nothing in his work that could produce either a mild or fatal heart attack; and that the work being performed was ordinary work which some people do at home "as part of general household duties." He then gave this testimony:
*168 "Q. Dr. Soloff, can you tell us why this man collapsed when he did at the time that he was doing this work on September 2nd, 1956, while reaching above his head in cleaning this wall of this liquidy syrup instead of his collapsing either before or thereafter?
A. No, I cannot."
Dr. Soloff admitted that he did not know how much effort was being exerted by Burkley on this occasion beyond what was told to him, although he conceded that strain or exertion in the nature of the physical work done by Burkley does throw an extra load on the heart, that it does increase the strain of the heart. When then asked whether the work done by Burkley was hard enough to cause this occlusion, he answered:
"I don't even know whether there was an occlusion."
Neither Dr. Gleason nor Dr. Soloff had examined the decedent. Their only information as far as his physical condition was concerned consisted of the findings in the autopsy report. Dr. Soloff admitted that sclerosis noticed throughout the artery with some decrease in lumen size meant that the internal diameter of that vessel was smaller than normal, and that the roughened, jagged area of the coronary wall as disclosed in the autopsy report indicated an abnormal condition. He agreed that the most direct cause of impaired blood flow to the heart is the narrowing of the arterial lumen and that the most important cause of a reduced coronary failure in the vast majority of cases is the result of atheroma. Yet the autopsy report refers to "some atheroscopic plaques noted." He conceded that he would not dispute the fact that Burkley had narrowed blood vessels to the heart. Dr. Gleason concurred in the view that sclerosis throughout the artery with some decrease in lumen size would detrimentally affect the flow of blood in the coronary vessels. He also stated that prostration or collapse is a frequent symptom of an acute coronary occlusion, while Dr. Soloff regarded prostration as a common symptom "in an unusually severe occlusion."
*169 It is noteworthy that the medical witnesses agree that the decedent had a pre-existing coronary artery disease, which predisposed him to a coronary occlusion. As Dr. Gleason, respondent's expert, put it:
"The individual with coronary artery disease is more liable obviously to develop a coronary occlusion than the individual without a coronary artery disease."
Yet there is disagreement among the doctors as to whether the autopsy protocol warrants finding of death due to acute coronary occlusion. Dr. Petinga, who actually performed the autopsy, so found, while respondent's experts, who examined his report disagreed. While petitioner's medical experts expressed a firm opinion that there was a causal relationship between the exertion and strain of decedent's particular work effort and his fatal collapse, those testifying on behalf of respondent were equally firm that Burkley's exertions and the mortal heart seizure were mere coincidence.
It would serve no useful purpose to detail the divergent medical views beyond the broad outlines noted above. We have made our own independent study and analysis of the record "to determine the facts and evaluate them." In doing so we have given "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses" and have given "full and respectful consideration of the views expressed, on both fact and law" by the Division and by the County Court. Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958).
We recognize that "it is to be presumed that * * * death from heart disease is the result of natural physiological causes, and the onus is upon the claimant to prove by a preponderance of the probabilities that the employment was a contributing cause of the * * * death." Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 138 (1958); Yeomans v. City of Jersey City, 27 N.J. 496, 509 (1958). Petitioner is entitled to prevail only in the event that the evidence preponderates in favor of the hypotheses *170 tendered by her. Augustin v. Bank Bldg. & Equipment Corp., 41 N.J. Super. 187 (Cty. Ct. 1956), affirmed 44 N.J. Super. 242 (App. Div. 1957). Recognizing that "the test is probability rather than certainty," Gilligan v. International Paper Co., 24 N.J. 230, 235 (1957), the burden of proof is sustained "if under the evidence the tendered hypotheses become a rational inference based upon the preponderance of the probabilities." Kream v. Public Service Coordinated Transport, 24 N.J. 432, 436 (1957); Pellegrino v. Monahan McCann Stone Co., 61 N.J. Super. 561, 672 (App. Div. 1959), affirmed 33 N.J. 73 (1960).
If a work-related episode aggravates a pre-existing condition, the workmen's compensation statute's requirement of causality is satisfied. Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13, 25 (App. Div. 1960) certification denied 34 N.J. 67 (1961). "It does not matter that one of the contributing causes of death or injury was a disease or condition unrelated to the employment as long as the employment was also a contributing factor." Dudley v. Victor Lynn Lines, Inc., 32 N.J. 479, 491 (1960).
Ciuba v. Irvington Varnish & Insulator Co., supra, 27 N.J., at p. 138, abolished the illusory distinction between usual and unusual strains and exertions, when it expressly overruled Seiken v. Todd Dry Dock, Inc., 2 N.J. 469 (1949), which had enunciated the rule that unusual strain or exertion beyond the mere employment itself is required to establish compensation liability in cases of heart disease. Thus, in Ciuba, 27 N.J., at p. 134, the Supreme Court noted that "where a heart ravaged by disease succumbs to strain or exertion arising from the doing of the master's work, even though it be but a normal incident of the service, in no sense extraordinary, and such as a sound heart could withstand," it is an accident within the meaning of the Workmen's Compensation Act. (Emphasis added) Accordingly, if the strain of the employee's usual exertions causes collapse from heart weakness, the injury is a compensable accident. Larson, Workmen's Compensation Law, §§ 38.10, *171 38.20, 38.30. While the County Court recognized that Ciuba had rejected the "unusual strain" doctrine, it nevertheless emphasized in its opinion that "there was nothing in the evidence to indicate that Burkley was performing a chore to which he was not accustomed or that he was exerting an effort beyond the ordinary stresses and strains of living. * * * The evidence discloses that his daily duties, as a fireman, were far more strenuous." It then stated:
"If, as the petitioner suggests, an employee, with a pre-existing heart disease, is engaged in any kind of physical labor and death ensues, and medical testimony is adduced to the effect that his work caused his death, then all that is necessary to sustain an award is that the employee shall have died of heart disease. I cannot subscribe to such a view." (Emphasis supplied)
We disagree with the logic of the stated reasoning. If the employee's work in fact caused his death, even though he suffered from a pre-existing heart disease so that the work was only a contributing cause, there is compensability. Ciuba so provides. See, too, Di Petrillo v. Borough of Leonia, 65 N.J. Super. 336 (App. Div. 1959), certification denied 31 N.J. 297 (1960); Williams v. Corby's Enterprise Laundry, 64 N.J. Super. 561, 568 (App. Div. 1960), certification denied 34 N.J. 330 (1961).
The County Court's emphasis upon the fact that the cleaning chore to which Burkley was assigned was not "unusual" or "unaccustomed" or "more strenuous" than his other duties as a fireman seemingly induced its conclusion that the work effort did not entail "a stress or strain * * * greater than the ordinary stresses or strains of living," to which reference was made in Jacobs v. Kaplan, 56 N.J. Super. 157 (App. Div. 1959). We recognize that this court did say in the Jacobs case, at page 165:
"In a heart case in which it appears that a previously diseased heart breaks down or otherwise fails while the employee is at work, a claimant has the burden of establishing by a preponderance of probabilities that the work effort preceding the occurrence of the failure entailed a stress or strain which was greater than the ordinary *172 stresses or strains of living and so was an event of happening beyond the mere employment itself." (Emphasis supplied)
However, that expression must be understood in the light of the factual context of that case. There, this court observed that there was no "specific" or "particular incident" which provoked the breakdown and that the picture was one of a "day-by-day wearing down of a diseased heart over a long period of time, without more." Such did not spell out an "accident." The total of all the testimony in Jacobs led "to the conclusion that what happened * * * was merely the end result of the degenerative process." Jacobs was not intended as any departure from the fundamental rule of Ciuba which held that if the strain of the employee's work-connected "usual exertions" in connection with a particular work incident does in fact cause collapse from heart weakness, the resultant injury or death constitutes a compensable accident. The rationale of Jacobs is illuminated in Dwyer v. Ford Motor Co., infra.
The stresses and strains of everyday living, properly understood, can be causative of heart failure, and if those stresses and strains are suffered by an employee in the performance of the normal duties of his job and that work effort contributes causatively to the fatal collapse by aggravating a pre-existing heart condition, there may be compensability. On the other hand, the intendment of the Jacobs decision is that the employee's death is not compensable merely because he dies on the job, where there is no showing that his work effort was causative even in a contributive manner to his demise. Thus, in Black v. Mahoney Troast Construction Co., 65 N.J. Super. 397 (App. Div. 1961), certification denied 34 N.J. 471 (1961), the employee, a night watchman, was found lying on the floor of store premises under construction by respondent. He was taken to a hospital, where he died three hours later. Concededly he had been in poor health for many years. Part of decedent's work routine was to gather empty soda bottles which construction *173 workers left in various parts of the building. A few coca-cola bottles were found a few feet away from where the employee was discovered. There was no evidence showing that the employee's collapse was in any way related to his employment duties. Compensation was denied.
In Tritschler v. Merck & Company, Inc., 66 N.J. Super. 116 (App. Div. 1961), certification denied 34 N.J. 580 (1961), the employee who occupied an executive position, suffered a heart attack while at his desk in respondent's plant. While walking thereafter to the infirmary, he collapsed and died. Here again there was no showing of any causal connection between the heart attack which he had suffered while seated at his desk and his employment. This court also rejected petitioner's contention that the walk to the infirmary was a work-connected event or happening upon which she might rest her claim for compensation. Thus the decedent's death was deemed to be the end result of his pre-existing heart disease, "the termination of the degenerative process." The petition was denied.
In Dwyer v. Ford Motor Co., 66 N.J. Super. 469 (App. Div. 1961), the employee suffered a severe heart attack on a Sunday while he was at home, and was attended by a doctor. He returned to work two days later and thereat suffered another attack. There was no history of a stress or strain suffered in the course of his work and medical testimony supported the conclusion that the decedent's demise was solely the result of the prolonged attack which had occurred at his home and which was not work-connected. In commenting upon the facts in the Jacobs case, this court observed in Dwyer, at p. 476:
"Concededly there was no identifiable work-connected incident which preceded or accompanied the onset of this attack. Rather, it appeared without contradiction that petitioner's cardiovascular system had gradually deteriorated over a lengthy period of time to the point where any effort however slight, even the exertion required to stay alive, was capable of producing the attack." (Emphasis supplied)
*174 We noted, at p. 477, that work efforts of a "somewhat laborious nature" are certainly beyond the "ordinary stresses and strains" of daily life even though they are "usual" to the employee. In Dwyer not only did we find that there was a lack of evidence of a specific work-connected event or happening beyond the mere employment, but, more importantly, the facts permitted of no reasonable inference that but for the work performed Dwyer would not have died when and as he did.
Somewhat analogous to the instant case, though differing in degree, are the facts in Mergel v. New Jersey Conveyors Corp., 14 N.J. 609 (1954), decided before Ciuba. The Supreme Court there found "unusual strain" upon a showing that a millwright, while installing a conveyor system, was required to work from a high ladder, close to the ceiling, and to reach out, to the side and overhead, about three feet, to drill holes in the ceiling. Seven days after commencing work, the millwright died from heart disease. It was held that the greater weight of the probabilities indicated that his death resulted from a coronary incident causally related to his employment. Justice Brennan, in a concurring opinion, shared with Justice Heher and Justice Jacobs, anticipatory of Ciuba, stated at p. 614:
"I state my concurrence separately because I regard as wholly illusory the distinction between usual and unusual strains and exertions * * *. [I]f the injury occurred by reason of the strain at work, whatever the degree of the strain, there is an accident in the statutory sense and there is no occasion for an inquiry whether the strain was an event or happening beyond the mere employment itself."
And see concurring opinion of Justice Heher in Lohndorf v. Peper Bros. Paint Co., 135 N.J.L. 352 (E. & A. 1947).
It is true that even under the Ciuba rule it remains of some probative significance whether the workman was at the time of the attack doing something to which he was not accustomed, or which involved a greater strain or burden than that to which he was accustomed. Loew v. Borough of *175 Union Beach, 56 N.J. Super. 93, 106 (App. Div. 1959), certification denied 31 N.J. 75 (1959). But such circumstances must be weighed with all the other proofs in arriving at the ultimate conclusion whether the heart episode was contributed to by the work or was solely attributable to natural causes.
As noted in Aromando v. Rubin Bros. Drug Sales Co., 47 N.J. Super. 286 (App. Div. 1957), mere coincidence of heart attack and work effort is not a permissible deduction in the face of evidence which, according to the teachings of long experience, demonstrates a causal relationship. "The sequence of events  the immediacy of the attack in relation to the episode of stress  bespeaks a causal connection." Aromando cites numerous cases at p. 289 in support of the view that emotional disturbance or physical overexertion or effort may be a competent, contributory cause of a coronary occlusion. "Like any other diseased condition, arteriosclerosis of the coronary vessels may, under certain circumstances, be aggravated by such trauma, resulting in a final occlusion." It notes, too, that the Division and our courts have time and again rejected the view expressed by some medical witnesses for employers that "effort and trauma are not causally related to coronary occlusion." See, also, 1 Larson, Workmen's Compensation Law, 566 (1952).
We are satisfied that the petitioner established by a preponderance of the probabilities that the exertion and strain of the particular work effort by her husband immediately prior to his collapse and demise operated as a contributing cause thereof, and but for which they would not have then and there occurred. The testimony engenders in our minds "the feeling of probability" of causal connection referred to in Ciuba, supra, 27 N.J., at p. 140.
Though Burkley's pathological condition was such that he might have died at any time thereafter by a similar non-work-connected strain, for example, while washing walls in his own home, the fact remains that here the strain, usual or unusual, which helped to strike him down, took *176 place in the performance of work for his employer. As the proverbial straw can break the camel's back, if the particular strain which fells the employee is the result of his work effort, there is a right to compensation.
We resolve the conflict in the medical opinions in favor of those advanced by petitioner's medical witnesses, because they are supported by the preponderance of probabilities. We find such support in Burkley's admitted predisposition to a coronary occlusion by reason of preexisting coronary artery disease, unknown to him; in the fact that his physical condition was further weakened by a two weeks' cold; in his performance of other duties throughout the day without incident, prior to his cleaning the toilet room walls; in the obvious stress and strain of the somewhat strenuous and special wall-washing episode, the awkward position he had to assume while reaching in various directions and to various heights on the wall from a fixed position on the toilet seat while washing the wall, as well as the other circumstances under which this specific work effort was performed, such as the warm atmosphere of the room; in the immediacy of his collapse while doing the job; in the autopsy findings and evaluations thereof by Dr. Petinga, whose personal observations and autopsy experience lend considerable weight to his conclusions; and in the totality of the evidence in the record.
In Ciuba, 27 N.J., at p. 139, the court said:
"In its nature, an exertion-induced injury may be difficult to prove when it involves coronary occlusion, myocarditis or dilatation of the heart. * * * Does the evidence reasonably give rise to a circumstantial inference of the requisite causal relation?"
We answer that question in the affirmative on the evidence in this case. The evidence fairly excludes the hypothesis that Burkley's death was not precipitated by his work effort, that it was a mere coincidence. "Indeed, the existence of a causal relation in these circumstances would seem to be *177 well grounded in common knowledge and experience." Ciuba, supra, 27 N.J., at p. 140.
The judgment of the Atlantic County Court is reversed, and that of the Division is reinstated.