69 N.J. Super. 347 (1961)
174 A.2d 221
MURRAY A. BAYER, PETITIONER-APPELLANT,
v.
FRANK P. FARRELL, INC., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1961.
Decided October 6, 1961.
*349 Before Judges PRICE, SULLIVAN and LEONARD.
Mr. Robert C. Gruhin argued the cause for appellant (Mr. Irving Edelstein, attorney).
Mr. Isidor Kalisch argued the cause for respondent.
The opinion of the court was delivered by PRICE, S.J.A.D.
In a workmen's compensation case petitioner seeks to reverse a judgment of the County Court, denying him compensation under R.S. 34:15-7 et seq., and dismissing his petition. He had been awarded temporary and partial permanent disability compensation against respondent by the Workmen's Compensation Division on that tribunal's determination that he had suffered "an attack of cardiac insufficiency." Petitioner contends that the proofs justify a finding that he suffered "a coronary incident causally related to strain and effort arising out of and in the course of his employment" with respondent. The latter contends that the County Court, on appeal to it pursuant to R.R. 5:2-5, properly dismissed the claim of petitioner because (a) petitioner failed to "establish by a preponderance of believable evidence" that a heart attack, suffered by him at work, arose out of his employment, and (b) the "medical proof offered by the petitioner failed to establish by a preponderance of probability that any employment connected effort either contributed to or caused his heart attack."
This case, as do many of the compensation "heart" cases decided by this court and the Supreme Court, illustrates the necessity of recognizing the principle enunciated in the opinion of Mr. Justice Oliphant in Mergel v. New Jersey *350 Conveyors Corp., 14 N.J. 609, 613 (1954), that "the decision in each case of this type must necessarily depend on its own particular facts." See, also, Pellegrino v. Monahan McCann Stone Co., 61 N.J. Super. 561, 572 (App. Div. 1959), affirmed 33 N.J. 73 (1960). It is to be noted that decisions in numerous compensation "heart" cases in this court, following the principles stated by the Supreme Court in Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127 (1958), have rested solely on the evaluation of the proofs adduced and have reemphasized the necessity of adhering with fidelity to the mandate pronounced in Yeomans v. Jersey City, 27 N.J. 496, 511 (1958), that we "independently weigh the evidence and determine whether the claimant has sustained the burden of proof." Furthermore, mindful of the opportunity afforded the judge in compensation to observe the appearance and demeanor of the witnesses, we are to give due regard to his advantage in judging their credibility and give "full and respectful consideration of the views expressed, on both fact and law," by the Division and the County Court. Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958).
In resolving the issues presented by this appeal it is also necessary to apply certain other pertinent principles enunciated by our courts. They are: (1) "The burden is on a petitioner to establish that he suffered an accident arising out of and in the course of the employment." Black v. Mahoney Troast Const. Co., 65 N.J. Super. 397, 403 (App. Div. 1961), certification denied 34 N.J. 471 (1961); (2) petitioner bears the burden of proof to justify a compensation award and such award is not sustainable unless the evidence preponderates in favor of the "tendered hypotheses." Kream v. Public Service Coordinated Transport, 24 N.J. 432, 436 (1957). See also, Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 449 (1958); Augustin v. Bank Bldg. & Equipment Corp., 41 N.J. Super. 187 (Cty. Ct. 1956), affirmed 44 N.J. Super. 242 (App. Div. 1957); (3) if "under the evidence the tendered hypotheses become *351 a rational inference based upon the preponderance of probabilities the burden of proof is sustained." Kream, supra, 24 N.J., at p. 436; (4) in assaying the evidence and determining whether petitioner has borne the burden of proof "the test is probability rather than certainty." Gilligan v. International Paper Co., 24 N.J. 230, 235 (1957); (5) "`Reasonable probability' is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact." Ciuba, supra, 27 N.J., at p. 139; (6) "`By accident' is now deemed satisfied * * * `either if the cause was of an accidental character or if the effect was the unexpected result of routine performance of the claimant's duties,' and accordingly, `if the strain of claimant's usual exertions causes collapse from heart weakness, back weakness, hernia and the like, the injury is held accidental.' Larson, Workmen's Compensation Law, §§ 38.10, 38.20 and 38.30." Ciuba, supra, at p. 139; (7) the "presumption subsists that injury from heart disease is the result of natural physiological causes, and the onus remains upon the petitioner to show by a preponderance of the probabilities that his employment was a contributing cause of the injury." Yeomans, supra, 27 N.J., at p. 509; Ciuba, supra, 27 N.J., at p. 138; (8) "An idiopathic collapse is not compensable simply because it occurred at the place of work during working hours." Gilligan v. International Paper Co., supra, 24 N.J., at p. 235.
In his petition filed approximately three months after February 5, 1958, the date on which he suffered the heart attack on which his compensation claim is based, petitioner, then 52 years of age, asserted that he suffered an "injured heart" and "strained chest" by reason of "unusual work circumstances and conditions in trying to install pipe in outlet." He had been employed for approximately 35 years as a plumber, pipe fitter and steam fitter and had been in respondent's employ for about seven months prior to the aforesaid heart episode. As initially related by petitioner *352 on direct examination at the Division hearing, he was working for respondent on February 5, 1958 as a pipe fitter, "hooking up fin radiators" on the first floor of an office building under construction at Newark; his hours were from 8 A.M. to 12 noon and, following "a half hour for lunch," from 12:30 to 4:30. On the day in question, petitioner and another employee were "working on that floor." At the hearing before the judge in compensation petitioner gave the following further recital of the events upon which he based his claim:
"Q. Tell the Court what you were doing? A. Well, after I had come back from lunch, I went back to my work to hook up the radiators; and in doing so, the connection that was coming up from the cellar, I had to make my connection from the cellar up to the radiator with a piece of pipe.
Q. How high was that? What was the distance? A. The distance was about a piece of pipe coming up from the basement to the radiator, about 27, 28 inches, somewheres around there.
Well, while bending over to see where the outlet was downstairs for me to be able to catch my pipe, as I couldn't see it because it was dark down in the basement, and many a times I had to go down into the basement to straighten out the outlet to catch the piece of pipe on the floor above, to be able to hook up the radiator, that I had done throughout the day  throughout the morning many a times, going down in this dark area to straighten out my outlets. But at this time while bending over to see where the outlet  whether it was coming up straight for me to be able to catch my pipe on the floor above, I felt 
Q. What were you doing before you felt anything? Tell the court exactly what you had in your hands? A. A piece of pipe.
Q. Tell the Court what you were doing? A. I was hooking up the fin radiator. I was trying to hook up the radiator. I had a piece of pipe in my hands, and I couldn't see to catch the outlet downstairs. I had to go down to straighten out the outlet. Coming back upstairs, I tried to catch the pipe to hook it up; and by doing so, I felt ill. My partner saw me. I fell over forward, he grabbed me and he pulled me back, and at that time I was  I couldn't see or do anything whatsoever."
Petitioner further stated that the pipe he was handling at the time of the episode was "27 or 28 inches in length," three-quarters of an inch in diameter and weighed two pounds; that he was kneeling in a small, confined area and *353 was sweating. He added: "I felt that the strain was too much for me at the time, of running around so much, and in this confined area where I didn't have too much room to work in, that it was a strain on my nerves throughout." He stated: "I had no spell except * * * at the moment * * * I was kneeling on my knees * * * trying to make that hookup, I felt the pressure, the sweat coming down from my body and losing my balance * * * I fell forward on my hands." He added: "I did not faint" and a co-worker "noticed the condition" and "picked me up."
Petitioner then related that the aforesaid co-worker helped him to a nearby construction shanty and from there he was taken to St. Michael's Hospital where he was confined for 17 days. While there he was under the care of Dr. Otto Brandman, then chief of service at that institution, and to whom reference is hereinafter made. After petitioner's discharge from the hospital he came under the care of his family physician, Dr. Benjamin Rosenberg, of Brooklyn, and so remained during the entire period of his convalescence. Petitioner received no medication after June 1958, and returned to work as a plumber the "latter part of August" of the same year. He has since continued working as a plumber and pipe fitter mainly on various construction jobs. In response to his counsel's interrogation, petitioner testified at the hearing in the Division on January 4, 1960 that he still had "headaches," had "a double vision at times," suffered "pain running down from the shoulders, * * * shortness of breath," requiring him to "rest for a few minutes until it passes away." He further testified that while under treatment by Dr. Rosenberg he was referred by the latter to Dr. Joseph Weinstein, a cardiologist of Brooklyn, who took electrocardiograms. On August 26, 1958 he was examined by Dr. Saul Lieb as a basis for the doctor's prospective appearance as a witness for petitioner at the Division hearing. Reference to Dr. Lieb's testimony is hereinafter made.
*354 On cross-examination petitioner stated that over the aforesaid period of his employment by respondent he had been working as a "pipe fitter" for the "heating" and "ventilation" of the building, installing the "rough work" and later "hooking up" the radiators, in which task he was engaged on the day in question. Describing the latter work performed by him on the morning of February 5, he said:
"* * * When I was working at that particular time I was working on the first floor to hook-up the radiators and I had to go down in the basement to straighten out the line so as I could catch my riser for the hook-up of the radiator. Going down in that basement a number of times throughout the morning in the darkness and up and down the ladder and straightening out my fittings below so as I could catch it below for the hooking up of the radiator because I had to catch it from the floor above  * * *."
In response to interrogation by respondent's counsel as to "how long after lunch" the heart episode occurred, petitioner testified:
"I had come back from lunch and started in to work on the radiators which I was doing at that particular time. While bending over for the hooking up in that spot which was so dark down below, looking down through the hole to see if my fitting is coming up to catch the piece of pipe for the hook-up, I fell over with a sweat on me and I had pain running down the side of my chest and my body.

* * * * * * * *
Q. This period of 10 minutes after you came back from lunch when you broke out into a sweat and fell over, was the first indication that you had that anything was wrong? Did you have any complaints or trouble before that? A. No complaints whatsoever.
Q. Did you have any indication before you actually broke out into a sweat and fell over that you were getting sick or anything was wrong with you? A. No, sir."
On further cross-examination petitioner testified that he had two sandwiches and two bottles of beer for lunch on the day in question and, on redirect examination, asserted that it was a "half hour to three-quarters of an hour after lunch" before he experienced the attack.
*355 In our assessment of the evidence in this case we observe initially that petitioner's own testimony was the sole factual evidence presented on his behalf. Although not a controlling factor, it is to be noted that because of contradictory statements in various portions of his testimony it is difficult to determine how soon after the lunch period petitioner claims the cardiac episode occurred  whether ten minutes after his return from lunch, as might be inferred from his initial description of the attack, or a half to three-quarters of an hour thereafter, as he later asserted. It is also difficult to determine from his testimony whether, in connection with his work, he had made more than one trip to the basement after the lunch period and before the attack, or whether his alleged frequent use of the stairs between the first floor and basement, on which use he leans heavily in support of his claim of work-connected strain, was confined to the morning hours on the day in question. It is clear, however, that at the time of the attack petitioner was simply engaged in bending over a small hole trying to adjust a pipe connection between the first floor and basement.
Although many pages of the record and extensive arguments by counsel are devoted to comparing petitioner's work efforts before and after the lunch period as bearing on the issue whether the coronary episode was or was not work-connected, there is no doubt from the proofs that much of the work petitioner had done in the course of the particular construction job was far heavier and more arduous than the work involved in "hooking up" the radiators. Our own review of the evidence also persuades us, as it did the County Court, that the work effort in which petitioner was actually engaged at the time of the coronary episode was of a slight nature when compared with his activity during the preceding months on the aforesaid construction job, and of minimal character when compared with the strenuous work which in his trade he had been accustomed to perform for over three decades. It was undisputed that petitioner had *356 experienced no adverse physical reaction during his morning work on the day in question.
The County Court, relying in part on the principles enunciated in Loew v. Borough of Union Beach, 56 N.J. Super. 93, 106 (App. Div. 1959), certification denied 31 N.J. 75 (1959), held that, although by reason of Ciuba, supra, 27 N.J. 127, "the petitioner no longer has the burden of proving that the coronary episode resulted from an unusual strain, it is of probative significance to ascertain whether what the petitioner `was doing at the time of the attack was something to which he was not accustomed or was of greater strain or burden than that to which he was accustomed.'" The County Court noted that the diagnosis by Dr. Brandman was that petitioner suffered a "coronary insufficiency secondary to arteriosclerotic heart disease"; that Dr. Lieb testified that although he had "no evidence" that Bayer "had any particular disability" therefrom it was "very likely" that Bayer had "coronary sclerosis that a man in his early fifties may have"; and that Dr. Sanford M. Lewis, appearing for respondent, had testified that petitioner suffered a "* * * coronary insufficiency resulting from coronary heart disease or arteriosclerotic heart disease" and that "this is a slow insidious process that goes on for many years" and "may occur any time, anywhere, and it does."
The county judge stated that the "fact that there was no clinical evidence of this pre-existing arteriosclerosis does not negate the opinions of all the experts who uniformly declared that such an infirmity existed." The court cited Jacobs v. Kaplan, 56 N.J. Super. 157 (App. Div. 1959), to the effect that "a claimant has the burden of establishing by a preponderance of probabilities that the work-effort preceding the occurrence or the failure entailed a stress or strain which was greater than the ordinary stresses and strains of living and so was an event or happening beyond the mere employment itself." Stating that petitioner "was not exerting himself at the time of the accident" but "was merely manipulating a two pound pipe," the court, in view *357 of all of the proofs adduced, held that the attack was not work-connected.
We are in accord with the result reached by the County Court but are convinced that beyond the factual analysis made by it and apart from the asserted similarity (disputed by appellant) between the case at bar and Loew, supra, and Jacobs, supra, lies a much more significant factor. The instant case not only furnishes striking illustration of the imperative necessity of an exhaustive analysis of the proofs presented in each workmen's compensation case (Yeomans, supra, 27 N.J., at p. 511), but, where revealed, the importance of assessing the significance of a petitioner's act in leaving crucial available evidence unpresented. In the case at bar not only do the proofs which petitioner elected to produce lack the persuasive quality to lead us to conclude, by a "preponderance of probabilities," that petitioner has shown that his employment was a contributing cause of his disability, but, in addition, and materially influencing our conclusion, is petitioner's failure (a) to present decisive evidence through the medium of testimony on that issue by petitioner's treating physicians, Doctors Brandman and Rosenberg, or to offer any explanation for its omission, and (b) to refrain from calling his co-worker to whom reference is hereinafter made.
With this in mind we turn to a critical analysis of the medical proofs bearing on petitioner's contention that his heart attack was work-connected. Generally in cases of this type the most significant, dependable and informative medical proofs bearing on that issue come from the physician or physicians who attend a stricken person following his attack and who care for him during the ensuing critical days of treatment. In the instant case Dr. Brandman occupied such a relationship with petitioner. He was petitioner's treating physician at the hospital. Petitioner came under that doctor's specific care immediately following the attack and continued as his patient during the entire period of confinement at St. Michael's Hospital. It was Dr. Brandman *358 who authorized petitioner's discharge from that institution after the passage of 17 days.
Moreover, it is to be recognized that frequently the testimony of a family physician is of the utmost importance in litigation involving a petitioner's claim of an alleged work-connected accident. Indeed, the testimony of such family physician in a case of that type may, under certain circumstances, be pivotal. Particularly is this so when, as here, the family doctor is also a treating physician. As above noted, petitioner turned immediately to Dr. Rosenberg after being released from the hospital. He remained under that doctor's case during the entire period of convalescence. The fact that Dr. Rosenberg was the Bayer family doctor and also that petitioner sought and received medical care from him for the post-hospitalization period speaks eloquently of the faith petitioner had in his skill and ability. Moreover, it is reasonable to assume that such family doctor status gave Dr. Rosenberg added valuable knowledge as to petitioner's prior physical condition  knowledge which the doctor could and undoubtedly did employ in the medical treatment of petitioner.
Despite the foregoing intimate professional relationship between the petitioner and Doctors Brandman and Rosenberg, the record is barren of any testimonial support from them that petitioner suffered a work-connected accident. Although Dr. Brandman was called by petitioner as a witness, the physician's testimony was in substance limited to a statement that the initial diagnosis of petitioner's condition on admission to the hospital was "possible coronary infarction," which, he said, "was subsequently changed to coronary insufficiency, secondary to arteriosclerotic heart disease." At no time during the course of Dr. Brandman's testimony did petitioner's counsel seek the doctor's opinion as to the claimed causal connection between petitioner's work and the attack for which petitioner seeks compensation benefits. Under the circumstances here present, such omission is of great significance. Possibly of even greater significance is the *359 fact that Dr. Rosenberg gave no testimony whatever. As a result, on the crucial issue of the instant case, we are deprived of the views of the two physicians most intimately connected with the petitioner's treatment, the two doctors whose testimony would be of the greatest aid in resolving that issue. Considering the vital role which they occupied, testimony from them might well have been conclusive on the sole issue presented  the claim that petitioner's work induced or contributed to the attack.
Urging that the differences between the case at bar and Loew, supra, and Jacobs, supra, support their contention that the County Court erred in deeming those cases controlling, petitioner contends that the decisions of this Court in Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13 (App. Div. 1960), certification denied, 34 N.J. 67 (1961); Di Petrillo v. Borough of Leonia, 65 N.J. Super. 336 (App. Div. 1959); and Burkley v. City of Atlantic City, 68 N.J. Super. 160 (App. Div. 1961), certification denied 36 N.J. 130 (1961), justify recovery in the instant case. The opinions in the cases last above cited recognize the propriety of the basic legal principles enunciated in Loew and Jacobs but emphasize that the cases are factually inapposite. The necessity that each case be resolved on its own facts in the light of the pertinent legal principles, hereinabove recited, is implicit in the detailed analyses contained in Joy, De Petrillo and Burkley, supra.
In the case at bar there exists the aforesaid important added element which, in our opinion, considered in conjunction with the proofs adduced, plays a vital role in resolving the issue of an alleged work-connected injury, i.e., the unexplained failure to present under oath the opinions of the aforesaid doctors who had the most intimate connection with the case. Testimony by Dr. Lieb, who examined petitioner only once and then solely in preparation for his appearance as a witness in the latter's behalf, cannot be a satisfactory substitute for the views of Doctors Brandman and Rosenberg based on their actual treatment of petitioner.
*360 In response to a long hypothetical question, which included a detailed recital of petitioner's description of his work, the frequent use of the stairs between the first floor and basement in connection with "hooking up the radiators," and which described the aforesaid collapse as having "occurred at about 1:00 or 1:20 P.M. in the afternoon, shortly after the petitioner came back from lunch," Dr. Lieb expressed the opinion that there was a "causal relationship" between the work Bayer did on February 5 and the attack of "acute coronary insufficiency." He stated the resultant disability was "20 per cent of total" and when asked: "Is that just for that episode or does that take in the entire cardiac condition," said:
"In my opinion they are the same. He may have had the usual amount of coronary sclerosis that a man in his early fifties may have, but I had no evidence he had any particular disability from it and I am estimating the disability as I found it for the residuals of an attack of an acute coronary insufficiency in which there is a certain amount of pre-existing sclerosis which was asymptomatic."
Under cross-examination, in which Dr. Lieb was interrogated as to the extent of petitioner's disability prior to February 5, 1958 due to arteriosclerosis, he answered: "Well, it would have to be speculative. I am assuming he had no disability based on the facts I have no evidence that he did have." He then amplified his statement under further interrogation as follows:
"Q. Was this arteriosclerosis affected in any way? A. Well, I have no evidence that it was.
Q. What disability do you give for the arteriosclerosis at the present time? A. I don't give any disability for pre-existing arteriosclerosis.
Q. No disability at all? A. Not unless I have evidence he had a disability."
Still later in the doctor's testimony he added:
"A. If the circumstances were such that he was working stooped over after lunch it would be significant because the type of lunch *361 of two sandwiches and two bottles of beer  any effort anyone does after a full meal. The digestion is a burden upon the coronary circulation. If everything were the same, the exertion that morning and this meal and then he was engaged in trying to connect the couplings I would say this could have done it."
Pursuing the latter declaration, the record shows that petitioner's counsel, on redirect examination, further explored the subject with the following result:
"Q. Doctor, the testimony is that he was trying to get this pipe into this small aperture or hole and he was sweating in trying to do it and he met with the attack. Assuming he had this meal of the sandwiches and beer and that he was required to come back to work and assuming that all he did was to bend over to look and see what could be done as to the manner in which the pipe could reach the coupling without having any pipe or coupling in his hand  but in the act of bending over. Can you, with some reasonable degree of medical certainty, tell us whether or not, under those circumstances, the heart episode was precipitated, one, by the fact that he had the heavy lunch which added an extra burden on his heart and two, the other burden of bending over and trying to determine if he would catch the pipe and the coupling  even with those facts eliminating the other situation? A. I would say that if you would add this fact that he was trying to determine how to fit the coupling, which in my mind, is associated with some degree of emotional strain, and that this added factor of bending over and after a heavy meal and these circumstances were preceded by running up and down stairs and the other factors would be competent to produce an attack of an acute coronary insufficiency.
Q. Forgetting about what preceded the work and forgetting about the fact he was running up and down the stairs in the morning and forgetting about all of the undue effort he was performing in the morning, we are now dealing with a man who went out to lunch and had two sandwiches and two glasses of beer. You say that in and of itself puts a burden on the heart? With that fact coupled with the fact he had to go back to work and while he was bending over trying to determine how to catch the pipe and the coupling, in doing that act, can you, with some reasonable degree of certainty, piecing together the added burden on the heart by reason of the meal  can you, with some reasonable degree of medical certainty, tell us whether or not, in your opinion, that was or it could have been the probably competent precipitating factor in producing the condition that you found? A. Well, in that case I couldn't be sure because the circumstances are not significant enough to have an opinion with the same degree of certainty as knowing that the man had been doing the other work as described on that morning."
*362 We then find that the question of the adverse physical effect of petitioner's aforesaid lunch loomed of still greater importance when on re-cross examination Dr. Lieb gave the following testimony:
"Q. Doctor, you say this lunch put a burden on his heart? A. This type of lunch. He had two sandwiches and two bottles of beer and shortly thereafter went to work.
Q. Would this lunch be a sufficient burden to cause an insufficiency attack? A. I have no evidence that it was. I wouldn't know from just that one circumstance.
Q. How much of an extra burden do you need to cause a coronary insufficiency? A. Suppose we assume that in this particular case he had the two sandwiches and two bottles of beer and he blew up with a lot of gas and indigestion and there was nothing else to consider before this lunch and that might very well be the trigger mechanism."
The only further medical testimony presented by petitioner was that of Dr. Samuel L. Pollock, a neurologist, who had examined petitioner on October 4, 1958 and on December 19, 1959. These examinations also were in preparation for testimony at the Division hearing. He testified that petitioner had an "anxiety psychoneurosis with a cardiophobia; a fear of heart attack," and, in response to a hypothetical question, voiced the opinion that "if the heart attack is compensable this anxiety is also compensable * * *."
Dr. Lewis, who examined petitioner for respondent on July 14, 1958, stated that petitioner had given him a history that on February 5, 1958 he was pursuing "his usual work. He had just returned from lunch * * *; he had a fairly substantial lunch, two meat sandwiches and three bottles of beer. Almost immediately after returning to the job he had to bend over in order to look through a hole in the floor" when he "suddenly felt a cold chill and lost his balance * * * felt sick and developed pain in the shoulders and chest." His diagnosis was that "petitioner suffered with arteriosclerotic heart disease and coronary insufficiency." In response to a hypothetical question he expressed the opinion *363 that there was no connection between petitioner's work and his condition.
We turn now to a consideration of the significance which may be attributed to petitioner's unexplained failure to call his co-worker as a witness.
While under our decisional law there is no requirement that a petitioner produce corroborative evidence if his testimony be worthy of credence, the burden remains with him to establish by believable testimony that the facts justify a determination that he suffered a compensable injury. As above noted, petitioner relies on his own description of the alleged nature and extent of his activities on February 5, 1958, including a description of the work he was performing at the time of the attack, all of which he asserts subjected him to stress and strain. The question posed is whether the facts and circumstances incident to his work, considered with the nature of the attack he allegedly suffered, justify a recovery of compensation benefits. In attempting to justify his claim that he was engaged in intensive effort and working under particular strain, petitioner implies that on the day in question he was working alone at the time of the attack as well as prior thereto, instead of as a member of a two-man team which was the customary procedure followed in "hooking up" radiators on the job. However, as above set forth, petitioner admitted that when he had the attack his co-worker "noticed the condition, * * * the way I was there, and at the time I fell * * *. He picked me up." He amplified this statement on cross-examination as follows: "At this particular moment my partner was there seeing me fall over and he come [sic] over and pulled me away because I was in front of a large plate glass window and he thought I would have gone through it at the time. So, he pulled me back."
Moreover, initially petitioner had testified on his direct examination that on the day in question he was working on the first floor as part of a two-man team. He testified:
*364 "Q. Were you working alone or were you working with a helper? A. I had a partner with me.
Q. When you say a partner, was he a helper or was he another co-worker? A. Another co-worker."
It is also to be noted that originally petitioner had testified that February 5 was the first day he had worked on the first floor. Later in his testimony he admitted he had been working there for a week, a fact which the foreman in his testimony confirmed. It is clear from the testimony of respondent's foreman that on the day in question there were six men working on the first floor "hooking up" radiators; that the men worked in teams and that a man was working with petitioner on that day.
As above stated, petitioner failed to produce his co-worker as a witness. In view of petitioner's present contention that his work was unduly burdensome because he was pursuing it alone, his failure to call his co-worker as a witness is most significant. Not only was such employee at the immediate scene of the attack, but, if called, his testimony would have been invaluable in determining the exact nature of the work in which petitioner had been engaged on the day in question, particularly at the time of the attack, and in assessing petitioner's basic claim that he was working under "strain." The failure to call this crucial witness was left unexplained.
We thus find petitioner seeking a compensation award without fortifying his case by a crucial lay witness, his co-worker, and without presentation of the medical testimony which in all probability held the key to the issue to be resolved. Our courts have spoken on this subject on many occasions.
In Bober v. Independent Plating Corp., 28 N.J. 160, 167 (1958), the court, speaking of the probative force of medical opinions, said:
"* * * In the process of evaluation, a criterion of recognized significance is the greater opportunity of a treating physician, as compared with a doctor who conducts a single examination in order *365 to become an expert medical witness, to know, understand and decide upon the producing cause of the patient's condition. Fusco v. Cambridge Piece Dyeing Corp., 135 N.J.L. 160, 162 (E. & A. 1947)."
See also, Conquy v. New Jersey Power & Light Co., 23 N.J. Super. 325, 330 (App. Div. 1952); Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 172 (App. Div. 1955), certification denied 20 N.J. 535 (1956).
Failure to call the aforesaid lay and expert witnesses permits the inference that "their testimony would not be as favorable to appellant as desired." Agresta v. Western Electric Company, 1 N.J. Super. 177, 179 (App. Div. 1949).
"* * * The unexplained failure of a party to produce a witness whom he would naturally be expected to call, permits the inference that his testimony would have been unfavorable to that party. Roach v. Yellow Cab Co., 6 N.J. Misc. 386 (Cty. Ct. 1928); Series Publishers, Inc. v. Greene, 9 N.J. Super. 166 (App. Div. 1950)." Schultz v. Hinz, 20 N.J. Super. 346, 351 (App. Div. 1952).
On the basis of our foregoing analysis we have, as above indicated, reached the conclusion that petitioner on his tendered hypothesis has not by a preponderance of probabilities borne the burden of proving a work-connected accident.
The judgment of the County Court is affirmed.