73 N.J. Super. 139 (1962)
179 A.2d 138
JAMES MOORE, PETITIONER-APPELLANT,
v.
ALLCAST NON-FERROUS FOUNDRY, INC., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 1962.
Decided March 15, 1962.
*140 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Solomon Golat argued the cause for appellant (Messrs. Talisman & Golat, attorneys; Mr. Golat, of counsel).
Mr. Thomas J. Brett argued the cause for respondent (Messrs. O'Brien, Brett & O'Brien, attorneys; Mr. Brett, of counsel).
The opinion of the court was delivered by PRICE, S.J.A.D.
This is an appeal by petitioner James Moore from a judgment of the County Court affirming the dismissal of his petition in the Division of Workmen's Compensation. Petitioner's employer, respondent Allcast Non-Ferrous Foundry, Inc., conceded at the Division hearing that petitioner suffered a work-connected left inguinal hernia. Respondent had paid petitioner's medical expenses and had also paid him temporary disability compensation covering a period of nine weeks. The sole issue before the Division and the County Court, as well as on the present appeal *141 before this court, was whether petitioner sustained any compensable permanent disability. The Division determined that no such disability had been established by the proofs. The County Court on a de novo examination of the record reached the same conclusion.
On May 27, 1959 petitioner, a laborer, suffered the aforesaid hernia while lifting material weighing about 100 pounds. On October 6, 1959 he underwent surgery for the correction of that condition. The operation was performed by Dr. S. Wolfe Emmer, who also treated petitioner post-operatively. Petitioner was discharged from the hospital on October 13, 1959 and released by Dr. Emmer on November 9, 1959.
Petitioner testified that when it rains, about "two inches" of the operative scar "hurts * * * it swells up, it blisters." He further testified that when he returned to work he became employed by a cleaning establishment as a driver of a panel truck, in which work he would "pick up and deliver clothes." He answered negatively a question as to whether that involved "any heavy lifting or any heavy, arduous work." Although he stated that pain interfered with his work once or twice a month, he stated that he was experiencing no discomfort while at the Division hearing.
Dr. Sidney Keats, who examined petitioner on June 16, 1959, prior to the operation, and on November 10, 1959, the day after petitioner was released by Dr. Emmer as aforesaid, testified for petitioner at the hearing in the Division on November 9, 1960. The doctor stated that at the first examination he observed that "the external inguinal ring was dilated. There was a large protrusion through the ring, extending into the scrotum; the mass was reducible." He then estimated "a partial permanent disability of 7 1/2 per cent of total."
Dr. Keats testified that his aforesaid re-examination on November 10, 1959, "revealed a healed incisional scar in the left inguinal area. The external ring was closed. There *142 was no protrusion through the ring on coughing or straining." As of that time the doctor estimated "a partial permanent disability of 5 per cent of total, with the residual effects of a left herniotomy." The doctor thought the operation was successful "as far as the repair of the hernia" was "concerned." Based on petitioner's then expressed "complaints" and the witness' "clinical findings," Dr. Keats stated that he reached his aforesaid conclusion of petitioner's permanent disability amounting to "5 per cent of total." In further explanation of the basis for his estimate we find the following testimony on Dr. Keats' direct examination:
"Q. Did he [petitioner] give you complaints, Doctor, of pain in the left inguinal area? A. Yes, sir.
Q. About the area of the scar? A. Yes, sir.
Q. And did he tell you that when it rains, the cut swells up and blisters and itches? A. No, sir. He told me, at one occasion, that there was swelling, but that was when he had the hernia.
Q. Well, is your estimate of disability based in whole or in part upon the complaints? A. I would say the estimate of disability is based upon his complaints as related to the structural changes resulting from the hernia repair."
On cross-examination Dr. Keats stated that at the time of his aforesaid examination on November 10, 1959, petitioner "had the result of a hernia repair in the left inguinal area as related to the structural changes." In response to interrogation as to whether there was "anything different about this scar than the normal case where there's been a repair of a hernia," he said: "Actually, there is no normal case. In order to effect a repair, you must alter the structure about the left inguinal area."
We find the following immediately thereafter:
"Q. But that is, Doctor, what happens in every case where you operate on for hernia. A. That's correct.
Q. And insofar as this case is concerned, was there anything different about the procedures or what you could observe as a result of the operation than in any other normal case? A. Well, I would say that, as I stated before, that if this Petitioner has persistent complaints in his left inguinal area, then there is a difference, because in most hernia repairs there is [sic] no persistent complaints.
*143 Q. The complaints, in so far as the Petitioner is concerned, are subjective, are they not. A. That's correct.
Q. Now, clinically or objectively, you observed nothing other than the repair of a hernia. A. That's correct.
Q. You have not seen this man since when, Doctor? A. November 10, 1959.
Q. In other words, your examination was made about a year ago. A. That's correct.
Q. And you were told, I believe, in the course of  before you started your direct examination, that the operation in this case was performed on or about October 5, 1959. A. That's correct.
Q. So that you saw him within approximately 30 to 35 days after the operation. A. That's correct.
Q. When you examined the Petitioner so soon after a herniotomy, Doctor, isn't it common to have the patient  a month post-operative, we'll say  have some complaints of tenderness in the scar and the like? A. Well, it depends on the individual case. The closer to the time of the operation, the more likelihood that there is of complaints. However, I'm assuming that his complaints have persisted today, as given to me in the hypothetical question.
Q. You found nothing objective, other than the herniotomy, to justify these complaints? A. He has the anatomical changes consistent with an adequate hernia repair.
Q. And you give this man 7 1/2 percent of total, Doctor, when he had the hernia, and now it's been repaired, you give him 5; so that the difference, in your opinion, between what he has today, a competently operated hernia, and an actual hernia, is 2 1/2 of total? A. That's correct.
Re-direct examination by Mr. Golat:
Q. Doctor, assuming that the Petitioner's complaints that I have referred to, the swelling and blistering when it rains, the itching, the pain in the lower end of the scar for a distance of an area of about two inches at the lower area of the scar on occasions of once or twice a month, that these have persisted, would you expect from the time of your examination of November 9, 1959 until the present time, that there would have been any changes in the appearance of the scar or in the general appearance of the abdomen on re-examination? A. I don't believe so.
Q. Do you think you would be helped in any way by a re-examination today? A. Only if the hernia has recurred. If his complaints are the same today, my opinion wouldn't change."
Dr. S. Wolfe Emmer, the operating surgeon, testified for respondent that the operation performed on petitioner was successful and that, as above stated, petitioner on November 9, 1959 was discharged by the doctor from further treatment. Dr. Emmer re-examined petitioner on the day of *144 the hearing and found "an imperceptible scar in the left inguinal region; no tenderness; no deformity; his genitalia were normal." The only physical complaint then expressed to Dr. Emmer by petitioner (Dr. Emmer testified) was "occasional soreness" at the "inferior margin of the operative scar." The doctor testified specifically that in his opinion there was no permanent disability. The witness said that he found the scar not to be tender and stated that he reached that conclusion because, "while examining [petitioner's] scrotum," he "palpated that scar very strongly, and there were no complaints."
Under cross-examination, amplifying his reasons for his opinion that no permanent disability existed, Dr. Emmer testified that, while theoretically "scar tissue is less elastic than normal tissue," in petitioner's "case * * * there's no diminishing; his leg is not pulled up. There is nothing here to indicate that the structural changes, though they have taken place, have in any way * * * produced * * * or will produce any functional loss to any degree whatsoever." He added that "theoretically * * * we assume that there are histological changes, but * * * this man's post-operative sequence was normal. There was no evidence of any infection and the scar that he has is less noticeable than an appendectomy scar. There is no tenderness * * *." The scar was "less noticeable than a gall bladder scar" or "a kidney operation. It is similar to a scar that you have following the removal of a cyst or a lipoma." He reiterated that the scar was not "tender" and, when pressed as to his basis for the statement, answered as follows:
"* * * If this patient tells me his scar is tender, I would put down that the scar is tender. But if I were to distract this patient's attention and examine the scar without his knowledge of it, and he did not say it was tender, I would not say that the scar was tender, even though his complaints was [sic] that he had a tenderness over the scar.
Q. You mean to say that you would say there is no disability even though the scar were painful? A. It depends on what time *145 you are asking. In other words, if a patient told me that five, six weeks after the operation he still had soreness or tenderness or discomfort in the site of an operation, I would unquestionably accept it, because at that time there is still swelling present. Now, at the time of my discharge, they frequently still have some residual swelling, but if they have no complaints, I discharge them. This patient had no complaints when he was discharged. And you heard the complaints that he gave me today; they, in themselves, are so insignificant that I could not possibly attach any clinical weight to it in view of my findings.
Q. I see. Now, Doctor, would you expect a patient who has no permanent disability as a result of a herniotomy, a year later, than to have no complaints of pain? A. I don't believe this patient has pain."
The judge in compensation, in concluding that the proofs revealed no permanent disability, dismissed the petition, characterizing petitioner's subjective complaints as "less than measurable."
On an independent review of the record the County Court reached the same conclusion. In doing so it stated that Dr. Emmer's testimony on the issue of plaintiff's condition was "convincing," as that doctor, said the court, was the "operating surgeon, he saw the man for a period after the operation, and he saw him over a year later." In contrast, Dr. Keats' second examination, the court stated, had been less than a month after petitioner was discharged from the hospital and approximately a year before the Division hearing. The court rejected the latter doctor's conclusion of the existence of permanent disability of "5% of total" after a successful operation, as compared with "7 1/2% of total," his preoperative estimate of disability.
In conformity with the requirements of the applicable decisional law we have independently analyzed and appraised the evidence in the case to determine the facts and evaluate them, giving "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses." Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958); Green v. Bell Cleaners, 65 N.J. Super. 311, 313 (App. Div. 1961), affirmed 35 N.J. 596 (1961).
*146 Petitioner challenges the soundness of the reasons advanced by the judge in compensation and by the County Court in denying petitioner's claim for permanent disability compensation. His counsel, both in oral argument and in his brief, stresses the subjective complaints voiced by petitioner and, analyzing the nature of the operation as described by Dr. Emmer, emphasizes the "formation of scar tissue," and that such tissue "is less elastic than normal tissues." Counsel poses the question: "Are not all of those phenomena [the detailed elements of the operation itself and the `histological changes' referred to in the testimony of Dr. Emmer] part of a `loss of physical function which detracts from former efficiency of the workman's body,' as required by the cases? Can we have `less flexible' tissue without deviation from the normal?"
Petitioner (asserts his counsel in his brief) "suffers a scarred `repaired' lower groin, disfigured, occasionally painful, uncomfortable and tender, that often swells and blisters. He has an impairment of his natural organism by major structural changes and formation of layers of scar tissue."
Citing N.J.S.A. 34:15-12(c) (23), petitioner states that in "cases of traumatic hernia `compensation will be allowed' as in other cases of disability." In noting counsel's further criticism of the opinions of the judge in compensation and of the County Court in the instant case, we find the following stated by him in his brief:
"Though not expressly stated therein, the decisions below imply a rule or policy which in effect forewarns the injured workman, `if you suffer an inguinal hernia, and are operated upon, you will receive no award for permanent disability.' This policy in fact is that currently prevailing in the conference rooms, and is the unstated and unwritten rule in the Workmen's Compensation Division.
The ultimate effect of such an unwritten policy would be to cause the injured workman to avoid necessary and timely operative treatment for inguinal hernia resulting from compensable accident, and to lead the workman instead to seek compensation for permanent disability in lieu of operation. The workman in pursuing such a course would customarily immediately realize an award of five *147 percent of total or $962.50 at the prevailing compensation rate of $35.00 per week.
Another incidental result of such a policy would be to induce the workman to seek an operation at a later date, but not under the provisions of the Workmen's Compensation Act. Since most workmen are today covered by hospitalization and medical-surgical insurance, he might secure the operation and hospitalization, without cost, and thereafter recover temporary disability benefits, either under the State Disability Benefits law, or under a private group plan.
The real effect, then, of a holding that operated inguinal hernias result in no permanent disability, might ultimately be to delay necessary operations in such cases and to shift the medical cost and the cost of temporary wage loss to industrial medical and health programs in which these items do not justly belong. Delaying of necessary hernia operations exposes workmen and industry to the added risk of aggravated disability due to strangulation of the hernia.
A wiser and fairer policy would therefore dictate the granting of a reasonable permanent disability award after operations, as an incentive to prompt medical care, and to leave the responsibility for the losses due to industrial accident within the jurisdiction of workmen's compensation coverage, where it properly belongs."
We have recited the proofs in considerable detail and outlined petitioner's contentions at length because it is clear to us that once more it is necessary to emphasize the basic principle that the "decision in each case * * * must necessarily depend on its own particular facts." Mergel v. N.J. Conveyors Corp., 14 N.J. 609, 613 (1954); Pellegrino v. Monahan McCann Stone Co., 61 N.J. Super. 561, 572 (App. Div. 1959), affirmed 33 N.J. 73 (1960); Bayer v. Frank P. Farrell, Inc., 69 N.J. Super. 347, 359 (App. Div. 1961), certif. den. 36 N.J. 597 (February 26, 1962).
The case at bar cannot properly be determined on the basis of any general comments referable to inguinal herniae, or of operative procedures relating thereto, or on any generalization allegedly descriptive of the effects of such operation, or on any sweeping statement of asserted permanent disability following an operation of that type, or on the alleged existence of a Division "policy," said to be lodged in an "unstated and unwritten rule" to the effect that *148 if an operation follows inguinal hernia "no award for permanent disability" will be made.
A substantial part of the brief of petitioner's counsel (as well as his oral argument) projects the contention that the instant case should be the medium for a pronouncement by this court referable to the subject of permanent disability following operations to correct inguinal herniae.
We perceive no need for any such general declaration. First: There is no statutory or decisional authority justifying any such asserted "unwritten" concept referable to denial of permanent disability compensation in dealing with work-connected inguinal herniae on which corrective operations have been performed. The pertinent statute to which we have heretofore referred specifically provides for the allowance of compensation for a traumatic hernia in an appropriate case, and petitioner has failed to direct our attention to any decision expressing a concept such as he asserts prevails.
Second: Such a concept would ignore the various types of inguinal herniae, their extent, age and condition at the time of operation, the presence or absence of infection, and would label all indicated operative procedures as uniform and productive of the same results.
We reject such a concept but, as petitioner's counsel has so strongly urged the alleged existence of an erroneous doctrine of noncompensability, following corrective operations for inguinal herniae, and to suggest obliquely that its application is responsible for the conclusions of the Division and County Court herein, we have felt obliged to express our views.
In justice to those tribunals we find no basis for concluding that the decisions in the instant case were based on any such hypothesis. Clearly, in a case where a petitioner, by a preponderance of the credible evidence, has established to the satisfaction of the judge in compensation or to reviewing courts the fact of permanent disability, an award therefor will be made. That burden, in the case at *149 bar, the Division and County Court found petitioner had not sustained.
Guided by the principles heretofore expressed, our independent analysis of the record and assessment of the proofs leads us to the same conclusion.
The issue in the instant case is determined on credibility and the application of the recognized principles governing the allowance of compensation for permanent disability. The treating physician determined that the surgical correction of what under the proofs was a simple hernia warranted the conclusion that no permanent disability existed. His opinion was based on his personal knowledge of the nature of the hernia in its preoperative stage, his precise knowledge of the operative procedure which he employed to correct the condition, his personal postoperative treatment preceding petitioner's discharge, and his physical examination of petitioner on the trial date after a calendar year had elapsed. Under those circumstances we believe that he was in a better position to express an opinion with reference to the question of permanent disability than was the expert witness for petitioner. As stated, the latter's most recent examination of petitioner was made the day after petitioner was discharged by the treating physician. Voicing the opinion that petitioner had suffered permanent disability amounting to "5% of total," the witness, as above noted, disclaimed any necessity for a current physical examination of petitioner to enable him to express an opinion on the issue of permanent disability. Despite the fact that he made no criticism of the operation or of the postoperative treatment, the doctor's opinion was that petitioner's permanent disability was diminished thereby only to the extent of 2 1/2% of total.
The only specific evidence bearing on any alleged impairment of petitioner's body efficiency came, as above set forth, from petitioner himself. In addition, it is by him only that any evidence referable to his resumption of work was given. He stated that at an unspecified time after the *150 operation he applied for work but was rejected on a pre-employment examination because of the "cut on [his] stomach." He also volunteered the statement at the hearing that "up until last month" he "wasn't able to work." It is significant that no lay or medical corroboration of such statement is revealed and the record is barren of any testimony linking the hernia with his alleged unemployment following the postoperative period of convalescence.
Petitioner's above-quoted complaints of occasional pain in the operative area were highly suspect in Dr. Emmer's opinion, partly because the palpation the doctor employed at the examination on November 9, 1960, produced no involuntary physical reaction from petitioner. Petitioner's alleged subjective symptoms were substantially relied upon by his expert witness in expressing the opinion as to permanent disability. Such alleged symptoms are not to be accepted in view of the aforesaid test applied on the hearing date, and consequently the expert opinion of petitioner's witness lacks persuasive quality. Cf. Bodnar v. Florence Pipe Foundry &c., Co., 136 N.J.L. 15, 17 (Sup. Ct. 1947), affirmed 137 N.J.L. 205 (E. & A. 1948); Kwaitkowski v. McCabe's Express, &c., Inc., 129 N.J.L. 305 (Sup. Ct. 1943). The criterion for determining permanent disability is "* * * whether the worker had lost any physical function detracting from his body's efficiency." Heidel v. Wallace & Tiernan, 37 N.J. Super. 522, 528 (Cty. Ct. 1955), affirmed per curiam 21 N.J. 335 (1956). See also, Walsh v. Kotler, 46 N.J. Super. 206, 215 (App. Div. 1957); Duncan v. T.I. McCormack Trucking Co., 43 N.J. Super. 352, 358 (App. Div. 1956); Rodriguez v. Michael A. Scatuorchio, Inc., 42 N.J. Super. 341, 351 (App. Div. 1956), certif. den. 23 N.J. 140 (1957); Burbage v. Lee, 87 N.J.L. 36, 38 (Sup. Ct. 1915).
Petitioner having failed, as we determine, to prove the existence of any permanent disability, the judgment of the County Court is affirmed.